**AMERICAN LEGACY FOUNDATION,**
a Delaware non-profit corporation,
Plaintiff,

v.

**LORILLARD TOBACCO COMPANY, a**
Delaware corporation, Defendant.

C.A. No. 19406.

Court of Chancery of Delaware,
New Castle County.

Submitted: Jan. 7, 2003.
Decided: Jan. 30, 2003.

David C. McBride, Richard H. Morse, Martin S. Lessner, Young, Conaway, Stargatt & Taylor, Wilmington, DE; Thomas P. McGonigle, John L. Reed, Duane Morris, LLP, Wilmington, DE; John Payton, Patrick J. Carome, David W. Ogden, Wilmer, Cutler & Pickering, Washington, D.C.; and Ellen Vargyas, of the American Legacy Foundation, Washington, D.C., for Plaintiff.

Stephen E. Herrmann, Robert W. Whetzel, Steven J. Fineman, Richards, Layton & Finger, Wilmington, DE; Jim W. Phillips, Jr., Robert J. King, III, Charles E. Coble, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Greensboro, NC, for Defendant.

### OPINION

LAMB, Vice Chancellor.

### I.

This action arises out of a landmark settlement agreement between the nation's largest tobacco companies and almost all the U.S. states and territories. As part of that settlement agreement, the signatories provided for the creation and funding of a

foundation whose mission is to educate youth about the harms associated with tobacco use and to reduce levels of youth tobacco use. This campaign has proven successful. As part of the settlement agreement, however, the signatories agreed to certain restrictions placed on the content of the foundation's educational programs. The most significant restriction, and the one that is at issue here, provides that the foundation may not engage in the "vilification" of or a "personal attack" on the tobacco companies or their executives. The same restriction appears verbatim in the foundation's bylaws as well.

After its creation, the foundation sponsored a series of television, radio and print advertisements aimed at reducing youth tobacco use and educating youth about health risks associated with tobacco. Thereafter, one of the tobacco companies threatened suit against the foundation for allegedly violating the anti-vilification provisions in the settlement agreement and the foundation's bylaws. Concerned about the possibility of the tobacco company filing suit in several jurisdictions, the foundation brought suit in this court against the defendant tobacco company seeking declaratory judgment on four counts, three of which are the subject of this motion for summary judgment. The foundation seeks a judicial declaration that the defendant has no standing to sue the foundation based on the settlement agreement or the foundation's bylaws. The foundation also seeks corresponding injunctive relief barring the defendant from bringing any claims against the foundation under either the settlement agreement or the bylaws.

The court concludes that summary judgment in favor of the foundation is not appropriate, and that summary judgment should instead be granted in favor of the defendant tobacco company with respect to its ability to sue the foundation under a contract theory based on the settlement agreement. This is due to the fact that the settlement agreement itself contemplates that the foundation will ultimately adopt it, and that the foundation in fact adopted the agreement. Because the identical anti-vilification provisions appear in both the settlement agreement and the foundation's bylaws, and because the court holds that the defendant tobacco company can bring an action against the foundation to enforce the settlement agreement, the court need not address whether the defendant tobacco company has standing to sue based on a breach of the foundation's bylaws.

## II.

### A. *ALF's Creation*

Plaintiff American Legacy Foundation ("ALF") was formed in 1999 as a Delaware non-profit corporation with the stated goal of creating advertising to reduce youth tobacco product usage in the United States. ALF exists by virtue of a Master Settlement Agreement (the "MSA") reached in 1998, whereby the nation's largest cigarette companies settled lawsuits brought against them by the attorneys general of 46 states (the "Settling States") seeking monetary and injunctive relief for the injuries inflicted by tobacco products upon the states and their citizens. Defendant Lorillard Tobacco Company ("Lorillard") is the oldest tobacco company in the United States and is a party to the MSA.

The M.S.A. itself clearly states that one of its principal objectives is to reduce the level of smoking by youth and increase the level of awareness in the country through the creation of ALF. The preamble of the M.S.A. specifically provides:

WHEREAS, the Settling States and Participating Manufacturers wish to

avoid further expense, delay, inconvenience, burden and uncertainty of continued litigation (including appeals from any verdicts), and, therefore, have agreed to settle their respective lawsuits and potential claims pursuant to terms which will achieve for the Settling States and their citizens significant funding for the advancement of public health, the implementation of important tobacco-related public health measures, including the enforcement of the mandates and restrictions related to such measures, as well as funding for a national Foundation [i.e., ALF] dedicated to significantly reducing the use of Tobacco Products by Youth.[1]

To achieve the educational goals of the MSA, the Settling States and the tobacco companies provided for the formation of ALF. The Settling States were responsible for the mechanics of forming ALF, and they effected its incorporation through the National Association of Attorneys General ("NAAG").[2] On March 4, 1999, ALF was incorporated as a non-profit, non-member corporation, organized under the laws of Delaware, with its principal place of business in Washington, D.C.[3] ALF's primary mission was "to support (1) the study of and programs to reduce Youth Tobacco Product usage and Youth substance abuse in the States, and (2) the study of and educational programs to prevent diseases associated with the use of Tobacco Products in the States."[4] The M.S.A. also sets forth the anticipated functions and activities of ALF, one of which is to "carry[ ] out a nationwide sustained advertising and education program to (A) counter the use by Youth of Tobacco Products, and (B) educate consumers about the cause and prevention of diseases associated with the use of Tobacco Products."[5]

Consistent with the MSA, and as specified in ALF's bylaws, ALF is governed by a particular board of directors meeting certain criteria. The eleven directors include two governors selected by the National Governors' Association, two state attorneys general selected by NAAG, and two state legislators selected by the National Conference of State Legislators. Those six directors select five additional directors, one of whom must have public health expertise, and four of whom must have expertise in medical, child psychology, or public health disciplines.[6] The M.S.A. did not provide for the tobacco companies to be given any role in the governance of ALF, either through the

---

1. Payton Aff., Ex. 2 (hereinafter, the "MSA") I. The tobacco companies clearly endorsed the public education mission expressed in the MSA. *See* M.S.A. § I ("WHEREAS, the Settling States and the Participating Manufacturers are committed to reducing underage tobacco use by discouraging such use and preventing Youth access to Tobacco Products ..."); MSA § VIII(a)(2) (requiring tobacco companies to meet with the attorneys general of the Settling States and with the Foundation to assess the success of the M.S.A. and to coordinate efforts to continue to reduce youth tobacco use).

2. NAAG itself is not a signatory to the MSA. NAAG is described in the M.S.A. as an "or-

ganization that is directed by the Attorneys General to perform certain functions under this Agreement." *Id.* at § II(bb).

3. ALF was originally incorporated under the name "MSA National Foundation," but it amended its certificate of incorporation on August 2, 1999 to change its name officially to the American Legacy Foundation. Vargyas Aff., Ex. 1 at Tab C.

4. MSA § VI(a).

5. *Id.* at §§ VI(a) & (f)(1).

6. *Id.* § VI(d); Vargyas Aff., Ex. 1 at Tab B, (hereinafter, "Bylaws") § 3.2.

appointment or selection of its directors or otherwise.

## B. *ALF's Funding*

Once created, ALF's primary source of funding was the tobacco companies, which are required to make two types of payments under the M.S.A. for the benefit of ALF. Pursuant to Section VI(b) of the MSA, the tobacco companies are required collectively to make "base foundation" payments of $25,000,000 per year for a period of nine years. These payments are used to "fund" ALF, and, pursuant to ALF's bylaws, ALF may use these funds to pay its administrative expenses.[7] In addition, Section VI(c) of the M.S.A. requires the tobacco companies collectively to make payments in the amount of $250,000,000 in 1999, and $300,000,000 per year for the next four years "for the benefit" of ALF's National Public Education Fund ("NPEF"). These NPEF payments are expended by ALF in its public advertising and education campaign.[8] Further, Section IX(e) of the M.S.A. provides that, if the tobacco companies' market share exceeds 99.05% in 2004, and any year thereafter, the tobacco companies shall continue to make NPEF payments "for the benefit of" ALF.

The tobacco companies are required to make payments into an escrow account before the funds are ultimately distributed to ALF.[9] The M.S.A. explicitly provides that the tobacco companies' payments of these funds into the escrow account are "made at the direction and on behalf of the Settling States."[10] Thus, ALF argues that the M.S.A. intended that the funds paid to the escrow agent be the property of the Settling States, and not the tobacco companies.[11] There can be little doubt, however, about where the money to fund ALF comes from. Sections VI and IX(e) of the M.S.A. unambiguously require the tobacco companies to pay the money used to fund ALF. The Settling States are not given any discretion or authority to choose what to do with these payments or to decide to direct them to any destination other than ALF.[12] Thus, even though the Settling States are interposed between the tobacco companies and ALF as money flows from the former to the latter, the M.S.A. is clear that this money is for the benefit of ALF and may go nowhere else but to ALF.

7. Bylaws § 12.1.

8. MSA § VI(c)(1). ALF may also use this money to make grants to states so that they may conduct similar campaigns. *Id.* at § VI(g).

9. *Id.* at § VI(a). An Escrow Agreement governs the escrow account, which is to be considered part of the M.S.A. as a fully integrated agreement. *Id.* M.S.A. § XVIII(y). The parties to the Escrow Agreement are the attorneys general of the Settling States (acting on behalf of their Settling States), the tobacco companies, and the escrow agent. ALF is not a party to the Escrow Agreement. Payton Aff., Ex. 2 at Tab C (hereinafter, the "Escrow Agreement").

10. *Id.* at § VI(h).

11. As support for this argument, ALF points to a revenue ruling obtained from the Internal Revenue Service. An issue arose related to whether interest earned on the funds in the escrow account was subject to federal income tax–which it would be if funds belonged to the tobacco companies. The IRS ultimately ruled that income earned on funds deposited into the escrow account is excluded from income tax because the underlying funds belonged to entities not required to pay federal taxes–that is the Settling States, and not the tobacco companies. Payton Aff., Ex. 2 at Tab D.

12. *See* M.S.A. §§ VI(b) & (c) (providing that base foundation payments and NPEF payments "shall be disbursed" to ALF by the escrow agent when the M.S.A. settlement has been consummated in at least one Settling State).

## C. *ALF's Restrictions*

As part of the long and arduous negotiations between the Settling States and the tobacco companies, the signatories to the M.S.A. agreed upon certain restrictions on what ALF could do with the money it receives.[13] Most of these limitations are found in Section VI(h) of the MSA, which provides generally that ALF "shall not engage in, nor shall any of [ALF's] money be used to engage in, any political activities or lobbying, including, but not limited to, support of or opposition to candidates, ballot initiatives, referenda or similar activities." Importantly, Section VI(h) goes on to carefully limit the ways in which the NPEF payments may be used, providing that:

> The National Public Education Fund shall be used only for public education and advertising regarding the addictiveness, health effects, and social costs related to the use of tobacco products and shall not be used for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively. [ALF] shall work to ensure that its activities are carried out in a culturally and linguistically appropriate manner.[14]

In addition to imposing the above-mentioned binding limitations upon ALF's activities, the M.S.A. provides that ALF's organizational documents "shall specifically incorporate the provisions of this Agreement relating to [ALF]...."[15] ALF, through its incorporator and through its initial board of directors, did exactly what it was supposed to do under the M.S.A. in this regard. In ALF's Certificate of Incorporation, Article IV lists the functions of ALF. These functions mirror the first nine obligations listed in Section VI(f) of the MSA. Also, Article III.C of the Certificate provides that ALF shall not engage in political activities, shall work to ensure that its activities are carried out in a culturally and linguistically appropriate manner, and shall carry out its activities only within the states. These restrictions are taken directly from Section VI(h) of the MSA.

Similarly, ALF's bylaws contain the anti-vilification provisions required by the MSA. The bylaws provide that ALF shall establish and administer the NPEF, which shall be used "only for public education and advertising regarding the addictiveness, health effects, and social costs related to the use of Tobacco Products" and shall not be used "for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively."[16] These provisions were taken directly from the M.S.A. as well. ALF and the tobacco companies agree that these bylaw provisions meet the requirements of the MSA.

ALF also incorporated other items of the M.S.A. into its bylaws. Article XIII of

---

**13.** The circumstances in which the M.S.A. arose explain why the M.S.A. places express limitations upon ALF's activities. Before the M.S.A. was executed, Florida had already created a non-profit corporation that was waging a "truth" campaign. This "truth" campaign attacked the tobacco companies and their executives, portraying them as evil and malicious. For example, one of the Florida "truth" campaign advertisements explicitly compared tobacco executives to Adolf Hitler and the Nazis. Another inflammatory advertisement portrayed a tobacco industry executive applauding tobacco's nomination for a "Demon Award" for "most deaths in a single year."

**14.** *Id.* at § VI(h).

**15.** *Id.* at § VI(d).

**16.** Bylaws § 12.2.

ALF's bylaws prohibits any amendment to the bylaws or to ALF's Certificate of Incorporation that would render either document inconsistent with the terms of the MSA. In addition, Section 5.7 of ALF's bylaws expressly recognizes the binding nature of the MSA. Section VI(e) of the M.S.A. required ALF to affiliate itself formally with an educational or medical institution. Section 5.7 of ALF's bylaws satisfies this requirement, providing that "the programs of [ALF] may be affiliated with one or more educational institutions selected by the Board of Directors from time to time *as required by the Master Settlement Agreement attached hereto as Exhibit A.*"[17]

### D. *The MSA's Enforcement Mechanism*

The enforcement provision of the M.S.A. is relatively straightforward and simple. It provides that "any Settling State or Participating Manufacturer may bring an action in the Court to enforce the terms of this Agreement (or for a declaration construing any such term ('Declaratory Order')) with respect to disputes, alleged violations or alleged breaches within such Settling State."[18] Nothing in Section VII or any other provision of the M.S.A. prohibits suit from being filed against ALF or suggests that a tobacco company may not sue a non-signatory that later adopts or otherwise becomes bound by the MSA. An ancillary agreement to the MSA, the Model State Fee Payment Agreement, contains just such an exclusion.[19]

### E. *ALF's Activities*

Since its formation, ALF has run "a nationwide public health campaign to educate the public, with a particular emphasis on youth, about the harms associated with tobacco products."[20] ALF's primary advertising campaign, entitled "the truth," includes the use of trade and service marks including "truth," "the truth," "infect truth," the truth.com and the like.[21] One of ALF's first advertisements featured people stacking body bags outside the headquarters of another signatory to the MSA, Phillip Morris USA ("Phillip Morris"). Phillip Morris, along with other tobacco companies expressed their belief that this advertisement and others made in similar fashion violated the MSA. In addition, the then-attorney general of North Carolina wrote to the other attorneys general expressing his concern that ALF's advertisements violated the MSA. In response to these complaints, ALF temporarily pulled certain advertisements. Throughout this time period, ALF never suggested that it was free from the obligations set forth in the M.S.A. or that Phillip Morris or the other tobacco companies lacked standing to challenge the allegedly vilifying advertisements. Rather, ALF argued that its advertisements complied with the MSA.[22]

---

17. *Id.* at § 5.7 (emphasis added).

18. MSA § VII(c)(1) (The Court "means the respective court in each Settling State to which [the MSA] ... [is] presented for approval and/or entry as to that Settling State." MSA § II(p)).

19. *See* MSA, Ex. O § 24 ("Nor shall any provision hereof bind any non-signatory or determine, limit or prejudice the rights of any such person or entity").

20. Vargyas Aff. ¶ 4.

21. Florida's "truth" campaign, described in note 13, *supra*, is wholly separate and distinct from the "truth" campaign employed by ALF.

22. *See* Gamble Aff., Ex. B (Bill Furmanski, Communications Manager for ALF, stating that the advertisements challenged by Phillip Morris "talk about the addictiveness of tobacco, the health effects of tobacco and the social cost of tobacco use. As long as we talk about those items and communicate effectively with young people, we are well within the limits of the settlement").

### III.

Lorillard first threatened litigation against ALF in July 2001, related to whether a particular radio advertisement called "Dog Walker"[23] complied with federal and state communications laws.[24] In November 2001, Lorillard sent a draft complaint to ALF based on allegations of defamation and unfair business practices related to the truth of factual assertions made in the "Dog Walker" advertisement. In January 2002, Lorillard changed the focus of its potential lawsuit. Rather than relying on common law or statutory claims for defamation and unfair business practices relating solely to the "Dog Walker" advertisement, Lorillard threatened to assert a contract claim based on the M.S.A. to attack the entire "truth" campaign.

By letter sent to ALF on January 18, 2002, Lorillard purported to invoke the enforcement mechanism of the M.S.A. against ALF by providing 30-days notice of its "intent to initiate a proceeding against [ALF] to enforce the terms of the MSA," as required by Section VII(c)(2) of the MSA.[25] Lorillard's January 18 letter alleged that ALF"s truth campaign had engaged in a "personal attack" on or "vilification" of Lorillard in violation of the MSA.

In response to the potential uncertainty relating to the potential for numerous lawsuits in various jurisdictions,[26] ALF filed suit against Lorillard in this court on February 13, 2002.[27] ALF"s complaint contains four counts: Count I seeks a declaration that Lorillard has no basis to sue ALF under the MSA; Count II seeks a declaration that Lorillard has no basis to sue ALF under its bylaws; and Count III seeks corresponding injunctive relief barring Lorillard from bringing any claims against ALF under either the M.S.A. or the bylaws. Count IV of the complaint, which is not a subject of ALF"s motion for summary judgment, seeks, in the alternative, a declaration that ALF"s truth campaign has been and is in full compliance with the M.S.A. and the bylaws.

---

**23.** The "Dog Walker" advertisement, which aired for six weeks in the summer of 2001 depicted a telephone call between an actor and two Lorillard employees. In the advertisement, the young man who plays the "dog walker" offers to sell dog urine to "you tobacco people" because dog urine contains urea, which is "one of the chemicals you guys put into cigarettes." Vargyas Aff., Ex. 1 ¶ 6.

**24.** For example, on October 1, 2001, Lorillard filed a Motion for a Declaratory Ruling with the Federal Communications Commission seeking a declaration that the "Dog Walker" advertisement violated an FCC rule regarding the broadcasting of recorded telephone calls. ALF opposed the motion, arguing that the FCC's rule, by its plain language, extends only to conduct of broadcast licensees and therefore does not apply to ALF, which is not a licensee, or its advertisements. The FCC has yet to issue a ruling on the motion.

**25.** Vargyas Aff., Ex. 1 at ¶ 20 & Tab A, Jan. 18 Letter.

**26.** Although Lorillard has not sued ALF anywhere other than North Carolina, the potential existed that Lorillard could bring separate lawsuits in every state that was a party to the MSA. In the *New York Times* on January 23, 2002, Lorillard spokesperson Steve Watson alluded to the possibility of "enforcement actions" against ALF in any or all of the 46 state courts with continuing jurisdiction over the M.S.A. and the related consent decrees. *See* Bernard Stamler, *Lorillard Tobacco Threatens Legal Action Against a Foundation for Its Tough Antismoking Campaign*, N.Y. TIMES, Jan. 23, 2002, at C12 ("It is conceivable that Lorillard might have to sue in all of those states, which it has not yet decided to do, Mr. Watson said").

**27.** *See generally American Legacy Foundation v. Lorillard Tobacco Co.*, 2002 WL 927383, at *2–3 (Del.Ch. Apr.29, 2002), for a more detailed account of the dealings between ALF and Lorillard leading up to this litigation.

On February 19, 2002, Lorillard filed a two-count complaint against ALF in the Superior Court of Wake County, North Carolina, seeking declaratory and injunctive relief, as well as damages in the amount of one dollar, for alleged breach of contract under the MSA. Also on February 19, 2002, ALF filed a motion with this court to expedite proceedings, and on February 22, 2002, this court issued an Order setting a schedule for briefing and argument on ALF's motion for summary judgment on its complaint.[28] Lorillard subsequently filed a motion for discovery pursuant to Court of Chancery Rule 56(f) in the event that this court finds that ALF is entitled to summary judgment on any of the counts contained in ALF's complaint. After briefing and oral arguments, and after the matter was stayed at the parties' request, the pending motions are now ripe for decision.

### IV.

Court of Chancery Rule 56 provides that summary judgment should be granted if the record evidence demonstrates "that there is no genuine issue as to any materi-al fact and that the moving party is entitled to a judgment as a matter of law."[29] The burden falls upon the moving party "to prove clearly the absence of any genuine issue of material fact which would affect the result," and in considering a motion for summary judgment, the court must resolve all doubt in favor of the non-moving party.[30] If, however, the evidence demonstrates that the *non-movant* is entitled to summary judgment, the court may grant summary judgment to the non-movant.[31]

### V.

#### A. *ALF Is Bound By The M.S.A. Because It Has Adopted The Agreement*

■ There is no doubt that a fundamental principal of contract law[32] provides that only parties to a contract are bound by that contract.[33] There is also no doubt that ALF was not a signatory to the MSA. One does not have to be a signatory to a contract, however, to become bound by it. Third parties to an agreement may become parties to it, and thus bound by it, by either expressly or implicitly adopting the

**28.** Lorillard moved to stay or dismiss this action in favor of its action in North Carolina. The court denied that motion. *American Legacy Foundation*, 2002 WL 927383, at *5. As of the date of this opinion, the North Carolina action is still pending.

**29.** Ch. Ct. R. 56(c); *see also Williams v. Geier*, 671 A.2d 1368, 1375 (Del.1996).

**30.** *Stroud v. Grace*, 1990 WL 176803, at *5 (Del.Ch. Nov. 1, 1990), *aff'd in part, rev'd in part on other grounds*, 606 A.2d 75 (Del.1992).

**31.** *See Bank of Del. v. Claymont Fire Co. No. 1*, 528 A.2d 1196, 1199 (Del.1987).

**32.** It is undisputed that "[b]asic contract principles apply to settlement agreements." *Williams v. Metzler*, 132 F.3d 937, 946 (3d Cir.1997).

**33.** *See, e.g., Wallace v. Wood*, 752 A.2d 1175, 1180 (Del.Ch.1999); *EEOC v. Waffle House,* *Inc.*, 534 U.S. 279, 294, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002) ("It goes without saying that a contract cannot bind a nonparty"); *see also Parker v. W. Dakota Insurors, Inc.*, 605 N.W.2d 181 (S.D.2000); *Dawson v. Temps Plus, Inc.*, 337 Ark. 247, 987 S.W.2d 722 (1999); *Plaza Props., Ltd. v. Prime Bus. Inv., Inc.*, 240 Ga.App. 639, 524 S.E.2d 306 (1999); *Am. Rock Mechanics, Inc. v. Thermex Energy Corp.*, 80 Ohio App.3d 53, 608 N.E.2d 830 (1992); *Nat'l Survival Game of New York, Inc. v. NSG of LI Corp.*, 169 A.D.2d 760, 565 N.Y.S.2d 127 (N.Y.App.Div.1991); *Mueller v. Penobscot Valley Hosp.*, 538 A.2d 294 (Me. 1988); *Bernard Johnson, Inc. v. Cont'l Constructors, Inc.*, 630 S.W.2d 365 (Tex.Ct.App. 1982); *Gambles v. Perdue*, 175 Mont. 112, 572 P.2d 1241 (1977); *Kahn v. Prahl*, 414 S.W.2d 269 (Mo.1967).

agreement.[34] A recent federal case explains:

> The general rule is that one cannot be held to a contract to which he is not a party. However, a party may later accept or adopt a contract and thus be bound by it. Thus, what constitutes acceptance becomes the threshold question. Acceptance can be accomplished by acts as well as words; no formal acceptance is required.[35]

The contract itself, however, must contemplate that non-signatories may adopt it. Thus, whether a non-signatory can nevertheless be bound to a contract through adoption is, in the first instance, a question of contract interpretation—that is, whether the original parties intended to create or permit future contractual obligations through adoption by non-signatories,[36] In this case, nothing in the M.S.A. precludes ALF from adopting, and the M.S.A. in fact contemplates that ALF will adopt.

### 1. The M.S.A. Contemplates Adoption By ALF

■ As both parties admit, no single provision in the M.S.A. expressly subjects ALF to enforcement actions by the tobacco companies under the MSA. ALF argues the text and design of the M.S.A. demonstrate that the M.S.A. does not contemplate any contractual relationship between ALF and Lorillard.[37] As support for this argument ALF points to certain provisions in the M.S.A. relating to the treatment of non-signatories other than ALF.

■ For example, the M.S.A. explicitly provides that it will bind the "successors" of the original tobacco company signatories.[38] In addition, in anticipation that ad-

---

**34.** See, e.g., Wiggins Ferry Co. v. Ohio & Mississippi Ry. Co., 142 U.S. 396, 408, 12 S.Ct. 188, 35 L.Ed. 1055 (1892) (holding non-signatory adopted contract "and made it its own"); Ayala v. Murrell, 97 So.2d 13 (Fla.1957); Central of Georgia Ry. Co. v. Woolfolk Chem. Works, Ltd., 122 Ga.App. 789, 178 S.E.2d 710 (1970); Peoples Sav. & Loan Ass'n v. Brinkoetter, 263 Ill.App. 391 (1931); Burnett v. Greenwood, 179 Kan. 706, 298 P.2d 256 (1956); Porter v. Gen. Boiler Casing Co., 284 Md. 402, 396 A.2d 1090 (1979); Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc., 126 Md.App. 294, 728 A.2d 783 (Spec.App.1999), cert. denied, 355 Md. 613, 735 A.2d 1107 (1999) (TABLE); Mehul's Inv. Corp. v. ABC Advisors, Inc., 130 F.Supp.2d 700 (D.Md.2001); White v. Nat'l Football League, 92 F.Supp.2d 918 (D.Minn.2000); Bronx Store Equip. Co. v. Westbury Brooklyn Assocs., L.P., 280 A.D.2d 352, 721 N.Y.S.2d 28 (N.Y.App.Div.2001); Larido Corp. v. Crusader Mfg. Co., 4 Misc.2d 231, 155 N.Y.S.2d 715 (N.Y.Sup.Ct.1956); Hann v. Nored, 233 Or. 302, 378 P.2d 569 (1963); Great W. Theatre Equip., Inc. v. M. & E. Theatres, Inc., 164 Wash. 557, 3 P.2d 1003 (1931), aff'd on reh'g en banc, 164 Wash. 557, 7 P.2d 1119 (1932) (per curiam).

**35.** Mehul's Inv. Corp., 130 F.Supp.2d at 707–08 (citations omitted).

**36.** See, e.g., White, 92 F.Supp.2d at 920 (stating that the first "fundamental issue[ ]," which "involves a purely legal question of contractual interpretation," is "whether the contracting parties intended to bind [non-signatory] player agents to the [original contract]"); Central of Georgia Ry. Co., 178 S.E.2d at 712–13.

**37.** It bears noting that well established canons of contract interpretation require courts to read a contract as a whole, and consistent with its purposes. See, e.g., Northwestern Nat'l Ins. Co. v. Esmark, Inc., 672 A.2d 41, 43 (Del.1996) ("[c]ontracts must be construed as a whole, to give effect to the intentions of the parties"); E.I. du Pont de Nemours & Co. v. Shell Oil Co., 498 A.2d 1108, 1113 (Del.1985) ("In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein"); USA Cable v. World Wrestling Fed'n Entm't, Inc., 2000 WL 875682, at *8 (Del.Ch. June 27, 2000).

**38.** See, e.g., M.S.A. § II(jj) (defining "Participating Manufacturer" as a "Tobacco Product Manufacturer that is or becomes a signatory to this Agreement," which will "also include the successor of a Participating Manufacturer").

ditional tobacco companies would join the settlement, the parties to the M.S.A. provided specific procedures to permit and facilitate those non-party tobacco companies' adoption of the MSA. No similar procedures or references were made with respect to ALF. Because the M.S.A. specifically identifies certain future non-signatories who will be bound by the contract while remaining silent as to other future non-signatories such as ALF, the argument goes, the maxim of *expressio unius est exclusio alterius* (the expression of one thing is the exclusion of another) requires that only the specifically identified non-signatories may become bound to the MSA.[39] This argument is not persuasive.

First, the examples ALF relies upon do not support the application of the *expressio unius* maxim to ALF. To begin with, the statement that successors-in-interest to the signatory tobacco companies shall be bound by the contract is little or nothing more than a statement of the law. It certainly does not imply that others may not become bound by the MSA. Additionally, the fact that the M.S.A. both (i) recognizes that non-signatory tobacco companies may later elect to join the M.S.A. and (ii) provides an express mechanism for them to do so hardly suggest an intention to exclude the adoption of the M.S.A. by ALF. Certainly, those provisions suggests an intention that those other tobacco companies could only become parties to the M.S.A. by following the prescribed procedure. ALF's relationship to the M.S.A. is, however, quite different.

In contrast to non-signatory tobacco companies, the nature of ALF and its rela-

tionship to the M.S.A. is discussed in significant detail throughout that contract. Indeed, to a large extent, the legal conclusion that ALF has "adopted" the M.S.A. flows directly from the parties' performance of their obligations under that contract. One could almost conclude that the M.S.A. *expressly* contemplates ALF's adoption because it provides for ALF's creation and funding, it requires ALF's board to be comprised of a predetermined group of people, and it places significant restrictions on ALF's activities. The Settling States (through NAAG) then obligated ALF, through provisions in ALF's by-laws and Certificate of Incorporation, to comply with the MSA, and the tobacco companies performed their part by providing the required funds.

In addition, there are several express provisions of the M.S.A. that manifest the MSA's signatories' expectation that ALF would ultimately adopt it. A clear example is Section IX of the MSA, which provides that if the Participating Manufacturers' market share exceeds 99.05% on April 15, 2004:

> each Original Participating Manufacturer shall severally pay to the Escrow Agent (to be credited to the Subsection IX(e) Account) for the benefit of [ALF] its Relative Market Share of the base amount of $300,000,000, as such payments are modified in accordance with this subsection (e). *Such payments shall be utilized by [ALF] to fund the national public education functions of [ALF] described in subsection VI(f)(1), in the manner described in and subject*

---

**39.** *See* 5 CORBIN ON CONTRACTS § 24.28 (rev. ed. 1998); *Delmarva Health Plan, Inc. v. Aceto,* 750 A.2d 1213, 1216 (Del.Ch.1999) (recognizing the applicability of *expressio unius* to contract interpretation, though ultimately not choosing to apply it); *Active Asset Recovery,* *Inc. v. Real Estate Asset Recovery Servs., Inc.,* 1999 WL 743479, at *11 (Del.Ch. Sept.10, 1999) (holding that omission of a term "speaks volumes" when considered next to included terms and citing to *expressio unius* maxim).

*to the provisions of subsections VI(g) and VI(h).*[40]

This Section's requirement that the Section IX(e) funds "shall be" used by ALF "in the manner described in and subject to" Section VI of the M.S.A. certainly appears to be directed at ALF. The same is true for Section VI(h) of the MSA, which instructs that ALF "shall not engage" in certain activities and that the NPEF funds shall not "be used to engage in" certain activities. Similarly, Section VI(e) of the M.S.A. provides that ALF "shall be formally affiliated with an educational or medical institution." For these reasons, the M.S.A. should be viewed, as a matter of law, as *expressly* contemplating ALF's adoption.[41]

Second, there are other agreements, executed contemporaneously with the MSA, that show that the parties to the M.S.A. knew how to avoid any question regarding whether non-signatories could become bound to the parties' contracts.[42] Exhibit O to the M.S.A. is a Model State Fee Payment Agreement. Section 24 provides:

> No provision hereof creates any rights on the part of, or is enforceable by, any person or entity that is not a Party or a person covered by either of the releases described in section 4 hereof, except that sections 5 and 20 hereof create rights on the part of, and shall be enforceable by, the state of STATE. *Nor shall any provision hereof bind any non-signatory or determine, limit or prejudice the rights of any such person or entity.*[43]

The italicized language from the Model State Fee Payment Agreement would support ALF's position, were it present in the MSA. It is not.

In fact, there are no provisions in the M.S.A. that foreclose adoption, ratification, or assumption of the M.S.A. by third parties or by ALF. There is also no provision in the M.S.A. precluding the tobacco companies from bringing breach of contract claims or enforcement actions against ALF under the MSA. Moreover, the language used in the MSA's enforcement provision appears conspicuously unrestrictive. Section VII(c)(1) provides that "any Settling State or Participating Manufacturer may bring an action in the Court to enforce the terms of this Agreement (or for a declaration construing any such term ('Declaratory Order')) with respect to disputes, alleged violations or alleged breaches within

---

**40.** MSA § IX(e) (emphasis added).

**41.** The fact that the tobacco companies may be able to pursue enforcement actions against ALF under the M.S.A. is of significant importance because the only other parties that might seek to enforce the restrictions on ALF's conduct are conflicted or are otherwise unwilling to do so. Both the Settling States and the various attorneys general involved in the M.S.A. negotiations bargained against the tobacco companies in arriving at the limitations on ALF's activities. Further, NAAG served as ALF's incorporator, and attorneys general from NAAG's membership sit on two of the eleven seats on ALF's board of directors. Finally, the Settling States have expressed to Lorillard that they do not intend to bring an enforcement action against ALF.

**42.** In this regard, the court notes that the parties to the M.S.A. are sophisticated persons who can be expected to have considered the interaction of provisions across the M.S.A. (and accompanying agreements) and the implications of including or excluding various terms and language in the MSA. *See Telcom–SNI Investors, L.L.C. v. Sorrento Networks, Inc.,* 2001 WL 1117505, at *5 (Del.Ch. Sept.7, 2001) ("I start with the plain meaning of the words chosen by sophisticated parties advised by experienced counsel"); *Instituform Technologies, Inc. v. Insitu, Inc.,* 1999 WL 240347, at *11 (Del.Ch. Apr.19, 1999).

**43.** MSA, Ex. O § 24 (emphasis added).

the Settling States."[44] Nothing in this Section provides that the tobacco companies may not pursue enforcement with respect to alleged violations or alleged breaches by entities other than the Settling States.

ALF also makes a series of other arguments that the text of the M.S.A. affirmatively supports its argument that the signatories never intended ALF to be bound. For example, ALF quotes a passage from Section VII(e) of the MSA, the relevant portion of which provides that liability "shall not be imposed or assessed against any employee, officer or director of any Participating Manufacturer, or against any other person or entity as a consequence of such breach...."[45] However, the language "[s]uch breach" refers to a breach of the M.S.A. by a tobacco company and not to breaches by the Settling States or other persons or entities. Thus, Section VII(e) only relates to the protection of directors, officers, employees, etc. from personal liability under the MSA. It has no effect on whether or not the M.S.A. signatories intended to bind ALF to the MSA.

ALF points to other passages that allegedly lend support to its textual argument. None of them do. The first collection of passages quoted by ALF merely identifies the Settling States and the tobacco companies as the entities entering into the MSA.[46] These passages are not relevant to this dispute because Lorillard readily admits that ALF was not an original signatory to the MSA. Similarly, a second group of Sections quoted by ALF are boilerplate pronouncements providing that the original parties to the M.S.A. entered into the M.S.A. freely and voluntarily, were represented by counsel, and had the requisite capacity to execute the MSA.[47] Again, these Sections have little relevance because there is no dispute regarding whether ALF was an original party to the MSA.

### 2. Express And Implied Adoption

■ Lorillard makes two arguments to support ALF's adoption of the MSA, thus making ALF amenable to suit from its breach: (1) explicit adoption through inclusion in ALF's organizational documents of mandates and restrictions relating to ALF that are set forth in the M.S.A. as well as various public statements made by certain directors and officers of ALF, and (2) implicit adoption through the receipt of funds paid to the Escrow Account by the tobacco companies. It is undisputed that ALF included such restrictions in its bylaws and that certain public statements were made by directors and officers of ALF. It is also undisputed that ALF received and used funds from the Escrow Account. The only dispute is a pure question of law as to the legal significance of these actions in light of the language and purpose of the MSA.[48]

44. *Id.* at § VII(c)(1).

45. *Id.* at § VII(e).

46. *See, e.g.,* Pl. Op. Br. at 21–22 (citing M.S.A. Preface (the M.S.A. "is made by the undersigned Settling State officials (on behalf of their respective Settling States) and the undersigned Participating Manufacturers"); § I ("the Settling States and the Participating Manufacturers, acting by and through their authorized agents, memorialize and agree as follows ...")).

47. *See, e.g., id.* at 22 (citing M.S.A. §§ XV ("The Settling States and the Participating Manufacturers acknowledge and agree that this Agreement is voluntarily entered into ..."); XVIII(g) ("Each Settling State and each Participating Manufacturer hereby represents that this Agreement has been duly authorized ...")).

48. *See DeCarlo v. Gerryco, Inc.,* 46 N.C.App. 15, 264 S.E.2d 370 (1980) (observing that whether uncontroverted facts constitute adoption is a question of law).

Express adoption arises in a variety of contexts, one of which is when a successor adopts a contract of a predecessor as its own.[49] In addition, adoption often occurs when an agent acts or purports to act on behalf of the principal, but does so without authority, and the principal subsequently agrees to be bound by the agent's acts.[50] Adoption in the preincorporation context is quite common as well.[51] These situations are roughly applicable to the present dispute. Essentially, ALF is the alter ego or successor-in-interest to the Settling States in carrying out the obligations required by Section VI of the MSA, as well as in receiving the benefits prescribed therein. Viewed differently, the Settling States acted as agents for ALF in securing benefits for ALF and in committing it to certain obligations under the MSA.

■ There are no magic words required to expressly adopt a contract.[52] Here, as discussed above, provisions in ALF's by-laws expressly recognize that ALF is bound by the MSA. ALF also has barred itself from changing its Certificate of Incorporation and bylaws in any way that would render them inconsistent with the terms of the MSA. Further, there are various public statements by ALF, including statements by its president and chairperson of its board of directors, that provide persuasive evidence that ALF believed it is restricted by and must comply with the MSA. These include the following statements:

- "Ms. Gregoire said she rejected a recommendation to run the 'Demon Award' spot as potentially violating the agreement. 'I want to be in absolute compliance with the settlement,' she said, adding that some proposed ads appeared to be 'vilification' of the industry."[53]
- "They talk about addictiveness of tobacco, the health effects of tobacco and the social cost of tobacco use. As long as we talk about those items and communicate effectively with young people, we are well within the limits of the settlement."[54]
- "[T]he M.S.A. enumerates the constraints under which the foundation must operate."[55]
- "Anyone who has seen truth ads know that they educate young people about the addictiveness, health effects, and social costs of tobacco, which is exactly what the Master Settlement Agreement says they must do."[56]
- "[ALF] will have resources in excess of $1 billion over the next four years for a public education campaign as directed by the Master Settlement Agreement between 46 states and the tobacco industry."[57]

■ Statements made by a non-signatory confirming that it is bound by a contract may establish that it has adopted the

---

49. *See, e.g., Hillard v. Guidant Corp.,* 37 F.Supp.2d 379, 381–82 (M.D.Pa.1999) (holding successor bound by contract of predecessor where successor accepted benefits of agreement).

50. RESTATEMENT (SECOND) OF AGENCY §§ 82, 84, 98 & 104 (1957).

51. *See* note 63, *infra.*

52. *Mehul's Inv.,* 130 F.Supp.2d at 707–08 ("Acceptance can be accomplished by acts as

well as words; no formal acceptance is required").

53. Gamble Aff., Ex. C.

54. Gamble Aff., Ex. B.

55. Gamble Aff., Ex. D.

56. Gamble Aff., Ex. A.

57. Gamble Aff., Ex. E.

contract.[58] ALF's bylaw provisions and public statements of ALF's officers and directors, both to the effect that ALF is bound by or must comply with the MSA, reflect ALF's explicit intent and consent to be bound by the MSA.

■ In addition to express adoption, non-signatories may implicitly adopt a contract through their conduct, rather than through words.[59] Furthermore, courts have found that acceptance of the benefits of a contract made for a third party's benefit may constitute implicit adoption.[60] A common situation in which courts have found implicit adoption by third parties is when a third-party beneficiary accepts the benefits of a contract made for its benefit, while attempting to avoid the contract's burdens.[61] For example, in *Westendorf* a non-signatory brought contract claims under a sales contract executed between the defendant and another party. The contract contained an arbitration clause, which the defendant sought to enforce against the non-signatory plaintiff. The plaintiff argued that the arbitration clause could not be enforced against her because she had not executed the contract containing it. Then Vice Chancellor Steele rejected the plaintiff's argument and held that she was bound by the contract in all respects.[62]

The reasoning in *Westendorf* is persuasive, and is applicable to the facts of the present dispute. This is particularly apparent given that the M.S.A. signatories plainly intended that Section VI of the M.S.A. would benefit ALF, and ALF plainly has accepted those benefits. The *Westendorf* court quoted *Corpus Juris Secundum* for the general proposition that "one who knowingly accepts the benefits intended as the consideration, coming to him or her under a contract voluntarily made by another in his or her behalf, becomes bound by reason of such acceptance to

58. *See, e.g., Donnelly v. Power Tech Sys., Inc.,* 1991 WL 158973, at *4 (E.D.N.Y. July 23, 1991) (finding adoption where the corporation referred to the contract in question in the corporation's prospectus); *Bronx Store Equip.,* 721 N.Y.S.2d at 29 (denying motion to dismiss contract claim against non-signatory to agreement, where defendant wrote a letter to plaintiff stating, "[w]e acknowledge that we owe you a balance of $300,000").

59. *See Mehul's Inv.,* 130 F.Supp.2d at 707–08 ("Acceptance can be accomplished by acts as well as words; no formal acceptance is required"); *Central of Georgia Ry.,* 178 S.E.2d at 713 (in considering whether there has been adoption by implication, the court should consider all circumstances, including "subject matter of the contract, the third person's acts and words, whether he acquiesced in the terms of the contract, performed its obligations, or accepted its benefits").

60. *See, e.g., Westendorf v. Gateway 2000, Inc.,* 2000 WL 307369, at *4 (Del.Ch. Mar.16, 2000), *aff'd,* 763 A.2d 92 (Del.2000) (TABLE) ("[O]ne who knowingly accepts the benefits intended as the consideration, coming to him or her under a contract voluntarily made by another in his or her behalf, becomes bound by reason of such acceptance to perform his or her part of the contract") (quotation and citations omitted).

61. ALF argues that under Section XVIII(p) of the MSA, ALF is not an intended third-party beneficiary of that Agreement. This is a misreading of Section XVIII(p). Section XVIII(p) provides, "[n]o portion of this Agreement shall provide any *rights* to, or be enforceable by, any person or entity that is not a Settling State or a Released Party." *Id.* (emphasis added). Section VIII(p) of the M.S.A. merely provides that ALF does not enjoy the *right* to enforce the MSA. This does not diminish the fact that ALF receives and has received intended *benefits* under the MSA. In fact, Sections VI(b), VI(c) and IX(e) unambiguously provide that the tobacco companies' base foundation and NPEF payment obligations are for the *benefit* of ALF.

62. *Westendorf,* 2000 WL 307369, at *4.

perform his or her part of the contract."[63] This is precisely what has happened here, as ALF has knowingly accepted benefits under the M.S.A. conferred by the tobacco companies in consideration of the promise that ALF would conduct its activities in certain specified ways.[64]

### 3. Preincorporation Agreements

Although not directly equivalent, an analysis of agreements executed by promoters in the preincorporation context provides significant guidance for deciding the current dispute. The preincorporation environment is perhaps the most common situation in which the doctrine of adoption is applied. The doctrine of adoption as it is applied to preincorporation agreements is straightforward. According to a leading treatise:

> American courts generally hold that promoters' contracts made on the corporation's behalf may be adopted, accepted or ratified by the corporation when organized, and that the corporation is then liable, both at law and in equity, on the

contract itself, and not merely for the benefits which it has received. *Accordingly, if the corporation accepts the contract's benefits, the corporation will be required to perform its obligations.*[65]

Under Delaware law, if the subsequently formed corporation expressly adopts the preincorporation agreement or implicitly adopts it by accepting its benefits with knowledge of its terms, the corporation is bound by it.[66]

The Settling States are highly analogous to promoters of ALF for purposes of the preincorporation agreement doctrine.[67] There is little doubt that ALF was created and formed by the Settling States. After all, it was the Settling States and the tobacco companies who came together and agreed that ALF be formed, and it is they who articulated ALF's mission, listed in detail its permissible functions, determined its funding sources, and set forth restrictions on its activities.[68] Furthermore, the Settling States achieved ALF's formation through NAAG, as was required by the

---

63. 17B C.J.S. § 631 (1999).

64. The *Westendorf* court also cited with approval *Shelter Ins. Co. v. Frohlich*, 243 Neb. 111, 498 N.W.2d 74 (Neb.1993). *Frohlich* held that a non-party to a medical pay provision in an automobile insurance policy was bound by a subrogation clause the policy contained, because the non-party accepted a contractual benefit of the insurance policy, namely payment of his medical bills. *Id.* at 78.

65. Carol A. Jones and Britta M. Larsen, 1A FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 207 (perm. ed., rev. vol. 2002).

66. *See Spering v. Sullivan*, 361 F.Supp. 282, 286 (D.Del.1973); *Stringer v. Elec. Supply Co.*, 2 A.2d 78, 79 (Del.Ch.1938) ("a promoter's contract is not a corporate obligation of its own force, but only when a statute or the charter makes it become such, or some subsequent corporate act adopts it or assumes the liability").

67. "Promoter" is a broad and flexible term, with no precise definition. *See* 18 AM.JUR.2D *Corporations* § 98 (1985) (stating that "promoter has no precise and inflexible meaning" and that it encompasses "one who actively assists in creating, projecting, and organizing a corporation"). *See also Blish v. Thompson Automatic Arms Corp.*, 64 A.2d 581, 595 (Del. 1948) (holding promoters are "those who undertake to form a corporation and to procure for it the rights, instrumentalities and capital by which it is to carry out the purposes set forth in its charter, and to establish it as fully able to do its business"); *Tin Cup Pass Ltd. P'ship v. Daniels*, 195 Ill.App.3d 847, 142 Ill. Dec. 732, 553 N.E.2d 82, 84 (1990) (promoter is "one who actively assists in creating, projecting and organizing a corporation").

68. *See* M.S.A. §§ I & VI.

MSA.[69]

There can also be little doubt that ALF"s promoters (*i.e.*, the Settling States) entered into the MSA, at least in part, for the benefit of ALF. Without the MSA, there would be no ALF. Most significantly, ALF"s promoters secured a binding commitment for ALF"s funding, and agreed to limits on how those funds could be used.[70] Courts have held that when a corporation's promoters enter into an agreement–either with each other or with third parties–to provide capital or funding for the corporation in exchange for performance by the corporation, it is a "clear-cut factual pattern" calling for application of the preincorporation agreement doctrine.[71]

■ Under the preincorporation agreement doctrine, a corporation implicitly adopts a preincorporation agreement by accepting its benefits with knowledge of its terms.[72] Further, under Delaware law, a corporation may adopt a preincorporation agreement in its organizational documents.[73] As discussed earlier, both forms of adoption took place here. In sum, the requirements of the preincorporation agreement doctrine appear easily met. ALF"s promoters entered into the M.S.A. on ALF"s behalf and for its benefit, and after its formation ALF expressly adopted the M.S.A. though corporate acts and explicit statements. ALF also implicitly adopted the M.S.A. by accepting its benefits with knowledge of its terms.

For all the foregoing reasons, the court concludes that the M.S.A. contemplates ALF's adoption, and that ALF in fact adopted it, thus becoming bound by its provisions and amenable to suit for its breach.

B. *Lorillard's Standing To Enforce Section 12.2 Of ALF's Bylaws*

ALF initiated this litigation because Lorillard threatened to pursue an enforcement action under the M.S.A. as a result of ALF"s alleged violation of the MSA's anti-"vilification" provision. ALF"s motion for summary judgment on Count II relates directly to the anti-"vilification" provision in the M.S.A. as incorporated in ALF"s bylaws. Specifically, ALF"s bylaws incorporate verbatim the M.S.A. provision banning use of the NPEF for "personal attacks" or "vilification."[74] ALF seeks to prevent Lorillard from obtaining standing to sue over ALF's bylaws because ALF

does not wish–and should not have to– operate under the specter that Lorillard or any other tobacco company may commence putative enforcement actions against [ALF] in a multiplicity of judicial fora every time any one of them reaches the self-interested determination that [ALF's] advertising is having a detrimental effect upon their business and allegedly is "vilifying" them.[75]

Thus, ALF concedes that its biggest concern is really the anti-"vilification" provision of the MSA, and nothing unique that may be contained solely within its bylaws.

---

**69.** *See id.* at § VI(d).

**70.** *See, e.g.,* M.S.A. § IX(e) (NPEF payments "shall be utilized by [ALF] to fund the national public education functions of [ALF] . . . and subject to the provision of subsections VI(g) and VI(h)").

**71.** *DeCarlo,* 264 S.E.2d at 374; *see also Stolmeier v. Beck,* 232 Neb. 705, 441 N.W.2d 888, 891 (1989).

**72.** *See Spering,* 361 F.Supp. at 286; *Donnelly,* 1991 WL 158973, at *3.

**73.** *Stringer,* 2 A.2d at 79.

**74.** Bylaws § 12.2.

**75.** Complaint ¶ 8.

Because it is abundantly clear that the only provisions of its bylaws that ALF seeks shelter from are the same provisions taken verbatim from the MSA, and because the court has determined that ALF may be sued under the M.S.A. itself for violation of those provisions, the court need not determine at this juncture whether Lorillard has standing to bring an action based on ALF's breaches of its bylaws.

C. *Lorillard's Motion For Discovery Pursuant To Rule 56(f)*

Because this court finds that ALF is not entitled to summary judgment on its claims, Lorillard's motion for discovery pursuant to Court of Chancery Rule 56(f) will be dismissed as moot.

## VI.

The parties shall consult and present a conforming order to the court ten (10) days from the date of this Opinion.