836 F.2d 789
 James P. LITTLE
v.
MGIC INDEMNITY CORPORATION and American Casualty Company,
a/k/a American Casualty Company of Reading, a
subsidiary of Continental Casualty
Company and CNA Financial
Corp., Appellants.
 No. 87-3061.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 11, 1987.
Decided Dec. 31, 1987.
Rehearing and Rehearing In Banc Denied Feb. 2, 1988.
 
 Theodore A. Boundas, Michael P. Tone, James A. Skarzynski (argued), Robert L. Suomala, Karen M. Costello, Petterson, Ross, Schloerb & Seidel, Chicago, Ill., Mark J. Gesk, Wayman, Irvin & McAuley, Pittsburgh, Pa., for appellants.
 Frederick W. Thieman (argued), Hilner, Thieman & Fraas, Pittsburgh, Pa., for appellee.
 Michael A. Pope, Michael M. Marick, Phelan, Pope & John, Ltd., Chicago, Ill., for amicus curiae American Reinsurance Co.
 Harry Boyd, Los Angeles, Cal., for amicus curiae Harbor Ins. Co.
 Joseph R. DeBriyn, Musick, Peeler & Garrett, Los Angeles, Cal., for amicus curiae Chicago Underwriters Group, Inc.
 Robert Spolyar, Lebanon, Ind., for amicus curiae Nat. Ass'n of Mut. Ins. Companies.
 Stephen A. Cozen, Richard C. Bennett, Cozen & O'Connor, Philadelphia, Pa., for amicus curiae Pacific Ins. Co.
 Before SEITZ and STAPLETON, Circuit Judges, and BROTMAN, District Judge.*
 OPINION OF THE COURT
 SEITZ, Circuit Judge.
 
 
 1
 Defendant MGIC Indemnity Corporation ("MGIC") appeals an order of the district court granting summary judgment in favor of plaintiff James P. Little, 649 F.Supp. 1460. This court has jurisdiction under 28 U.S.C. Sec. 1291 (1982).
 
 I.
 
 2
 Beginning in 1983, Union National Bank ("UNB") was named as defendant in a series of lawsuits brought by other lending institutions. In each of these actions the institutions allege that two UNB customers obtained funds from them on the basis of fraudulent letters of credit issued by UNB. UNB subsequently named Little as a third-party defendant in each of these lawsuits. Little was, until September 1983, a vice president and officer in the commercial loan department of UNB. UNB's third-party complaints allege that Little issued the fraudulent letters of credit pursuant to a conspiracy with the customers to place the credit of UNB at risk.
 
 
 3
 In 1982 UNB had purchased a directors' and officers' insurance policy ("the policy") from MGIC. In general terms, the policy insured directors and officers of UNB, including Little, against liabilities they might incur as a result of their conduct as employees. This policy was in effect during the time of Little's alleged malfeasance and at the time UNB filed its claims against him. Faced with the prospect of having to defend several lawsuits and unable, for obvious reasons, to obtain financial assistance from UNB, Little sought to have MGIC assume the costs of his defense under the terms of the policy. MGIC refused, maintaining that its obligation to pay Little's defense costs arises, if at all, only after the disposition of the claims against him.
 
 
 4
 Little then filed this declaratory judgment action against MGIC in the district court, seeking a determination that MGIC was required under the policy to pay his defense costs as they came due. Upon Little's motion for summary judgment, the district court found that the language of the policy was ambiguous on this point and should therefore be construed against the insurer.[1] Accordingly, the court ordered MGIC to make contemporaneous payment of Little's attorneys' fees and other defense costs. This appeal followed.
 
 II.
 
 5
 Our review of a grant of summary judgment is plenary. Like the district court, we must determine whether the record reveals a disputed issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law. The district court found, and we agree, that the material facts of this case are not in dispute.[2] Determination of the proper coverage of the policy is therefore a question of law. Niagara Fire Ins. Co. v. Pepicelli, Pepicelli, Watts & Youngs, P.C., 821 F.2d 216, 219 (3d Cir.1987). Both parties agree that Pennsylvania law governs our determination.
 
 
 6
 Because interpretation of the policy centers on the interaction of several of its provisions, it is necessary to quote these provisions at length. Language particularly significant in the present dispute is italicized.
 
 
 7
 [T]he Insurer agrees: (A) With the Directors and Officers of the Association that if, during the policy period, any claim or claims are made against the Directors and Officers, individually or collectively, for a Wrongful Act, the Insurer will pay, in accordance with the terms of this policy, on behalf of the Directors and Officers or any of them, their heirs, legal representatives or assigns all Loss which the Directors and Officers or any of them shall become legally obligated to pay.
 
 
 8
 ....
 
 SECTION 1--DEFINITIONS
 
 9
 ....
 
 
 10
 (D) The term "Loss" shall mean any amount which the Directors and Officers are legally obligated to pay ... for a claim or claims made against the Directors and Officers for Wrongful Acts and shall include but not be limited to damages, judgments, settlements, costs (exclusive of salaries of officers or employees), and defense of legal actions, claims or proceedings and appeals therefrom and cost of attachment or similar bonds....
 
 
 11
 ....
 
 SECTION 3--EXCLUSIONS
 
 12
 (A) [T]he Insurer shall not be liable to make any payment for Loss in connection with any claim made against the Directors or Officers:
 
 
 13
 ....
 
 
 14
 (5) brought about or contributed to by the dishonesty of the Directors or Officers. However, notwithstanding the foregoing, the Directors and Officers shall be protected under the terms of this policy as to any claims upon which suit might be brought against them, by reason of any alleged dishonesty on the part of the Directors or Officers, unless a judgment or other final adjudication thereof adverse to the Directors or Officers shall establish that acts of active and deliberate dishonesty committed by the Directors or Officers with actual dishonest purpose and intent were material to the cause of action so adjudicated.
 
 
 15
 ....
 
 SECTION 5--COSTS, CHARGES AND EXPENSES
 
 16
 (A) No costs, charges and expenses shall be incurred or settlements made without the Insurer's consent which consent shall not be unreasonably withheld; however, in the event such consent is given, the Insurer shall pay ... such costs, charges and expenses.
 
 
 17
 ....
 
 
 18
 (C) The Insurer may at its option and upon request, advance on behalf of the Directors or Officers, or any of them, expenses which they have incurred in connection with claims made against them, prior to disposition of such claims, provided always that in the event it is finally established that Insurer has no liability hereunder, such Directors and Officers agree to repay to the Insurer, upon demand, all monies advanced by virtue of this provision.
 
 
 19
 The basic principles of Pennsylvania law governing the interpretation of insurance policies are well-settled. Where the language of the policy is clear and unambiguous, a court is required, as with any contract, to enforce that language. Standard Venetian Blind Co. v. American Empire Ins. Co., 503 Pa. 300, 304, 469 A.2d 563, 566 (1983). If possible, a court should interpret the policy so as to avoid ambiguities and give effect to all of its provisions. Houghton v. American Guaranty Life Ins. Co., 692 F.2d 289, 291 (3d Cir.1982). However, if the policy, when viewed as a whole, is reasonably susceptible to more than one interpretation, it is considered ambiguous. Vlastos v. Sumitomo Marine & Fire Ins. Co., 707 F.2d 775, 778 (3d Cir.1983). Any legitimate ambiguity must be resolved against the insurer. Id. The principle of construing ambiguities against the insurer is fully applicable to policies purchased by commercial entities. ACandS, Inc. v. Aetna Casualty & Sur. Co., 764 F.2d 968, 973 (3d Cir.1985).
 
 
 20
 The policy at issue here follows a format common to many types of insurance policies in that it first defines the coverage of the policy broadly and then carves out exceptions to this coverage. Section 1(D) of the policy indicates that officers' and directors' defense costs are a type of "loss" generally covered by the policy. Section 3 spells out the circumstances under which the insurer is not obligated to pay for loss, including defense costs. The only exclusion relevant here is contained in section 3(A)(5), which provides that the insurer has no obligation to pay for loss if a final adjudication establishes that "active and deliberate dishonesty" was material to the claim giving rise to the loss. From these provisions it is clear that MGIC may at some point have an obligation to pay Little's defense costs. The dispute in this case concerns when this obligation attaches.
 
 
 21
 Both parties focus their arguments largely on the language and effect of the "option clause" of section 5(C), but before turning to these arguments we think it useful first to consider when MGIC's obligation to pay defense costs would attach in the absence of section 5(C). We begin by noting that, as its title plainly indicates, the policy is a liability policy rather than an indemnity policy. In general, under an indemnity policy the insurer is obligated only to reimburse the insured for covered loss that the insured himself has already paid. Under a liability policy, by contrast, the insurer's obligation to pay arises as soon as the insured incurs liability for the loss; the insured need not pay the loss first. See 11 G. Couch, Cyclopedia of Insurance Law 2d Sec. 44:4, at 187-88 (M. Rhodes ed. 1984). The language of section 1(D) is entirely consistent with the characterization of the policy as a liability policy. A "loss" is defined as an amount that the insured is "legally obligated to pay." Although this section does not explicitly speak to the timing of the insurer's duty to pay, the only reasonable interpretation is that this duty arises at the time the insured becomes "legally obligated to pay." To infer any other, later time for the insurer's duty to pay would be arbitrary because nothing in section 1(D) itself gives any guidance as to when this later time might be.
 
 
 22
 The exclusion set forth in section 3(A)(5) does not affect this interpretation. This provision states that the insured "shall be protected ... unless" there is a judicial finding of active and deliberate dishonesty on the part of the insured. This language certainly cannot be read as postponing the insurer's duty to pay until the question of the insured's dishonesty is resolved. As section 1(D) indicates, the policy expressly contemplates that claims against the insured may end in settlement, in which event the issue of dishonesty would never be adjudicated. We read section 3(A)(5), in conjunction with section 1(D), as imposing upon the insurer a duty to pay loss as the insured incurs legal obligation for such loss, subject to the requirement that the insured reimburse any monies received if it is subsequently determined in a judicial proceeding that he engaged in active and deliberate dishonesty. This analysis is in agreement with the one set forth in PepsiCo, Inc. v. Continental Casualty Co., 640 F.Supp. 656, 659 (S.D.N.Y.1986), in which the court interpreted a directors' and officers' insurance policy that was identical in all material respects to the one at issue here except that it had no analogue to section 5(C) in the present policy.
 
 
 23
 Having determined that section 1(D) of the policy imposes upon the insurer a duty to pay the insured's defense costs as they come due (subject to the insurer's conditional right to reimbursement), we now turn to MGIC's contention that the option clause of section 5(C) alters what would otherwise be its duty under the policy. MGIC contends that this clause places payment of "expenses" completely within the discretion of the insurer until the disposition of the underlying claim against the insured. Defense costs, MGIC argues, clearly fall within the plain meaning of the term "expenses." MGIC further maintains that because this provision specifically addresses the insurer's duty to pay pre-disposition expenses, it is sufficient to carve out an exception to the duty of contemporaneous payment established by the general language of section 1(D). Under this reading of the policy, MGIC may at its option elect to pay Little's defense costs as they come due, but it has no obligation to do so.
 
 
 24
 MGIC buttresses its textual analysis of the policy with a practical argument. Section 3(A)(5), MGIC notes, excludes coverage in cases of active and deliberate dishonesty, but this exclusion would be effectively nullified as to defense costs if the policy were read to impose on the insurer an obligation to pay these costs before disposition of the underlying claim. This is so because in cases in which there is a finding of active and deliberate dishonesty the insured is required to satisfy the adverse judgment out of his own funds, and he would rarely have the resources both to satisfy this judgment and to reimburse the insurer for the defense costs. Thus, in most cases of active and deliberate dishonesty, the insurer would be forced to absorb the defense costs itself, notwithstanding the plain language of section 3(A)(5).
 
 
 25
 If we were simply called upon here to decide whether MGIC's interpretation of the policy is reasonable, we would be compelled to say that it is. Under Pennsylvania law, however, our analysis of an allegedly ambiguous insurance policy does not end with the determination that the insurer has set forth a reasonable interpretation of the policy. We must go on to examine the interpretation offered by the insured. If this interpretation is also reasonable, the policy is ambiguous and must be construed against the insurer. Vlastos, 707 F.2d at 778.
 
 
 26
 In this case, we agree with Little that one could reasonably read the policy as a whole as imposing upon MGIC a duty to pay an insured's defense costs as they are incurred. Thus, the policy is ambiguous and must be construed against MGIC to require it to pay Little's defense costs as they come due, subject to MGIC's conditional right to reimbursement under section 3(A)(5).
 
 
 27
 Central to this conclusion is our belief that section 5(C) is, at best, extremely unclear in its attempt to modify the duty of contemporaneous payment imposed by section 1(D). Rather than explicitly negating this duty as to pre-disposition expenses in general, or as to defense costs in particular, section 5(C) modifies one affirmative representation of when the insurer will pay (the "legally obligated" language of section 1(D)) with another affirmative representation of when the insurer will pay (the option clause of section 5(C)). If MGIC's intent was to carve out an exception to section 1(D), it could have easily done so using alternative language that put the matter beyond reasonable question. That it instead chose to employ a more opaque formulation is, under Pennsylvania law, a factor tending to suggest that the policy is ambiguous. See id.; Celley v. Mutual Benefit Health & Accident Ass'n, 229 Pa.Super. 475, 482, 324 A.2d 430, 434 (1974).
 
 
 28
 It is true, as MGIC notes, that section 5(C) deals specifically with payment of pre-disposition expenses whereas section 1(D) addresses the payment of "loss" generally, but this is not determinative. When a general clause clearly includes a particular item within its coverage and a specific clause does not clearly exclude it, the item is covered. See 2 G. Couch, supra, Sec. 15:71, at 326-27. In this case, section 1(D) clearly includes defense costs within the insurer's duty of contemporaneous payment, and section 5(C) fails clearly to exclude such costs from the scope of this duty.
 
 
 29
 The obscure interaction between section 5(C) and section 1(D) is only one aspect of the policy's ambiguity concerning the time for payment of defense costs. Section 5(C) also appears unclear when read in conjunction with section 5(A). The latter provision requires the insured to obtain the insurer's consent before incurring "costs, charges, and expenses." Both parties agree that Little has complied with this requirement as to the retention of his current defense counsel.[3] Unlike section 5(A), section 5(C) refers only to "expenses." MGIC characterizes this as an entirely inconsequential variation in wording, but we disagree. The policy is noteworthy for its lengthy and detailed definition of "loss." The terms "cost," "charge," and "expense" are not defined anywhere in the policy, nor are they distinguished from each other or from the term "loss." Nevertheless, one might plausibly read the reference in section 5(A) to "costs, charges, and expenses" as comprehending all predisposition expenditures that could possibly fall within the definition of "loss." Against this background, section 5(C)'s references to "expenses" alone is significant. One could reasonably understand the option clause of section 5(C) to apply only to one type of expenditure within the broader category of "costs, charges, and expenses," and because "expenses" is not defined, one could then conclude that defense costs do not fall within its meaning.
 
 
 30
 In Okada v. MGIC Indem. Corp., 823 F.2d 276 (9th Cir.1987), the Court of Appeals for the Ninth Circuit confronted precisely the same issue and the same policy language that we address here. The court affirmed the district court's finding that the policy was ambiguous as to the time for payment of defense costs; it therefore construed the ambiguity against the insurer and ordered contemporaneous payment of these costs. Other courts have reached the opposite result in cases involving identical policy language, holding that the option clause unambiguously places pre-disposition payment of defense costs within the discretion of the insurer. See Luther v. Fidelity & Deposit Co., 679 F.Supp. 1092 (S.D.Fla.1986); Enzweiler v. Fidelity & Deposit Co., No. 85-99, slip op. (E.D.Ky. May 13, 1986) ; Clandening v. MGIC Indem. Corp., No. CV-83-2432-LTL, slip op. (C.D.Cal. May 23, 1983). For the reasons set forth above, we agree with the conclusion of the Okada court that section 5(C) fails clearly to modify the general duty of contemporaneous payment imposed by section 1(D). We also believe that the case law supports our reading of the policy in a somewhat different respect: that different courts have arrived at conflicting interpretations of the policy is strongly indicative of the policy's essential ambiguity. See Cohen v. Erie Indem. Co., 288 Pa.Super. 445, 451, 432 A.2d 596, 599 (1981) ("The mere fact that several ... courts have ruled in favor of a construction denying coverage, and several others have reached directly contrary conclusions, viewing almost identical policy provisions, itself creates the inescapable conclusion that the provision in issue is susceptible to more than one interpretation.").
 
 
 31
 MGIC argues that requiring the insurer to pay for defense costs as they come due will frustrate the intent of section 3(A)(5) by making it virtually impossible for the insurer to recoup these payments if the insured is subsequently found to have been actively and deliberately dishonest. This does not undermine our conclusion that the policy is ambiguous. At most, this argument demonstrates that MGIC has sound business reasons for wishing not to be bound to pay an insured's defense costs before resolution of the underlying claim. The argument does not prove that MGIC succeeded in drafting a policy that unambiguously states this intention. Moreover, although an insured might not have sufficient resources both to satisfy the underlying judgment and immediately to reimburse the insurer for his defense costs, the insurer would presumably have a valid claim against the insured's assets for the amount of defense costs. Collection may be difficult, but we are unwilling to say that this necessarily renders section 3(A)(5) meaningless.
 
 
 32
 MGIC also contends that a Comptroller of the Currency regulation in effect at the time the policy was issued prohibits contemporaneous payment of Little's defense costs. The regulation governing indemnification and insurance of bank directors and officers provided in relevant part as follows:
 
 
 33
 (c) [I]n order to preserve incentives for sound banking principles neither the bank's articles of association, bylaws, shareholder resolutions nor insurance shall provide for the indemnification of bank personnel who are adjudged guilty of, or liable for, willful misconduct, gross neglect of duty, or criminal acts.
 
 
 34
 12 C.F.R. Sec. 7.5217 (1982).[4] MGIC recognizes that Little has not been adjudged liable for any willful misconduct, but it asserts that, because of the practical difficulties it would likely face in recouping defense costs from Little in the event of such an adjudication, our interpretation of the policy may provide Little with indemnification of the sort prohibited by the regulation. We disagree. An insurer may have difficulty in obtaining reimbursement, but this does not eliminate the insured's legal obligation to repay the insurer under section 3(A)(5) of the policy. We conclude that the imposition of such an obligation in cases of active and deliberate dishonesty is sufficient to satisfy the policies of the Comptroller's regulation.
 
 III.
 
 35
 Accordingly, the judgment of the district court will be affirmed.
 
 
 36
 STAPLETON, Circuit Judge, dissenting.
 
 
 37
 I respectfully dissent.
 
 
 38
 Under Pennsylvania law, an insurance "policy, like every other contract, must be read in its entirety and the intent gathered from a consideration of the entire instrument." Smith v. Cassida, 403 Pa. 404, 408, 169 A.2d 539, 541 (1961). Meaning and effect must be given to all of its provisions. Galvin v. Occidental Life Ins. Co., 206 Pa.Super. 61, 64, 211 A.2d 120, 122 (1965). While an ambiguous "policy provision is to be construed in favor of the insured and against the insurer," Standard Venetian Blind Co. v. American Empire Ins. Co., 503 Pa. 300, 305, 469 A.2d 563, 566 (1983), a "court should read policy provisions to avoid ambiguities, if possible, and not torture the language to create them." St. Paul Fire & Marine Ins. Co. v. United States Fire Ins. Co., 655 F.2d 521, 524 (3d Cir.1981) (applying Pennsylvania law). In order to ascertain whether an ambiguity exists, a court must "determine if [the] words may reasonbly admit of different meanings." Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 (3d Cir.1980) (applying Pennsylvania law) (emphasis supplied). Thus to be reasonable and therefore capable of creating an ambiguity, an alternative reading of the policy must produce a rational result.
 
 
 39
 As the majority acknowledges, MGIC's reading of the policy takes all of the policy provisions into account and produces a rational result. Little's reading does neither of these things.
 
 
 40
 I perceive no "obscure interaction," at 795, between Section 1(D) and Section 5(C) of the policy. Section 1(D) provides that this is a liability, rather than an indemnity, policy. Section 5(C) provides that the insurer has the "option" to pay "expenses which ... [Directors or Officers] have incurred in connection with claims made against them, prior to the disposition of such claims." The only way the relationship between these two sections could be made any clearer is if Section 5(C) not only said that the insurer has an option to pay these expenses prior to the disposition of the claim, but also said that it has the option not to pay them prior to such disposition. Since the latter statement is clearly implicit in the former, however, it should not be necessary to include it.
 
 
 41
 In the final analysis, Little's argument that the policy is ambiguous rests entirely upon the use of the phrase "costs, charges and expenses" in Section 5(A). He does not deny that attorney's fees come within the commonly accepted meaning of "expenses which ... [Directors or Officers have] incurred in connection with claims made against them" as that phrase appears in Section 5(C). The ambiguity is said to be created by the inclusion of a statement in Section 5(A) that "no costs, charges and expenses shall be incurred ... without Insurer's consent." Little finds an intentional distinction here which the majority declares to be "significant." At 795. Neither Little nor the majority, however, suggests why these parties might want to draw a distinction between two categories of reimburseable items as inherently indistinguishable as "charges" and "expenses" when speaking of the timing of payments for litigation expenses. Because I can think of no "expense incurred in connection with a claim" that would not also be a "cost or charge incurred in connection with a claim," Little's suggested distinction, for me, "tortures the language of the policy" and reads MGIC's option under Section 5(C) out of the agreement of the parties.
 
 
 42
 As the majority explains, because directors and officers are not covered by the policy when they are found to have acted with deliberate dishonesty, MGIC's option to withhold payments for litigation expenses until after disposition of the claim is eminently reasonable; it follows that the district court erred in declaring that option unconscionable. Accordingly, I would remand with instructions to enter summary judgment for MGIC.
 
 
 
 *
 The Honorable Stanley S. Brotman, United States District Judge for the District of New Jersey, sitting by designation
 
 
 [1]
 The district court also held, in the alternative, that the policy would be unconscionable under Pennsylvania law if it unambiguously did not require MGIC to pay Little's defense costs as they came due. Our resolution of the question of the policy's ambiguity makes it unnecessary for us to address the unconscionability issue
 
 
 [2]
 In opposing Little's motion for summary judgment, MGIC submitted affidavits from certain of its employees and agents demonstrating that at the time it issued the policy it did not intend to be obligated to make contemporaneous payment of defense costs. MGIC maintains that this evidence was sufficient to preclude summary judgment because it raised a genuine issue of material fact as to the intent of the contracting parties. This position is incorrect. MGIC presented no evidence to suggest that it communicated its intent to Little or UNB before issuing the policy, and the uncommunicated subjective intent of one party to an insurance policy is immaterial to the interpretation of the policy. Celley v. Mutual Benefit Health & Accident Ass'n, 229 Pa.Super. 475, 483, 324 A.2d 430, 435 (1974). Thus, MGIC's affidavits did not create an issue of material fact, and the district court's disposition of this case on summary judgment was appropriate
 
 
 [3]
 The precise operation of section 5(A) is somewhat unclear. At oral argument, counsel for MGIC suggested that the section does not contemplate a single "blanket" consent by the insurer at the outset but rather a series of consents as various expenditures are required. In any event, it is undisputed that Little has obtained from MGIC whatever consent section 5(A) requires as to the defense costs he has incurred to date, and there is no allegation that MGIC has "unreasonably withheld" its consent to any expenditure
 As an alternative to his argument that the policy is ambiguous, Little contends that the "shall pay" language of section 5(A) in itself makes the policy a "duty to defend" policy, i.e., obligates the insurer to make contemporaneous payment of (consented to) defense costs with no right to reimbursement from the insured in the event that the insured is found to have engaged in active and deliberate dishonesty. This argument is implausible, for two reasons. First, nothing in section 5(A) speaks to the timing of payment; "shall pay" does not necessarily mean "shall pay as the insured becomes legally obligated to pay." Second, section 5(A) must be read in conjunction with section 3(A)(5), which gives the insurer the right to reimbursement of payments when there is a finding of the insured's active and deliberate dishonesty.
 
 
 [4]
 This provision was subsequently amended, and it now allows a national bank to purchase insurance covering the liability of its officers and directors to the extent permitted by the law of the state in which the bank is headquartered. 12 C.F.R. Sec. 7.5217(d) (1987). In interpreting a contract, of course, we presume that the parties intended the contract to conform to the law in effect at the time it was formed. See 2 G. Couch, supra, Sec. 15:43, at 267