PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-3336
_____

AMERICAN LEGACY FOUNDATION, RP
Appellant

v.

NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PA; TRAVELERS INDEMNITY
COMPANY OF AMERICA
_____

Appeal from the United States District Court
for the District of Delaware
(D.C. Civ. No. 1-07-CV-00248)
District Judge:  Honorable Sue L. Robinson
_____

Argued July 15, 2010
Before:  FUENTES, VANASKIE and WEIS, Circuit Judges.

(Filed:  October 12, 2010)

Richard D. Shore, Esquire (ARGUED)
Mark A. Packman, Esquire

Kami E. Quinn, Esquire
John D. Niles, Esquire
GILBERT LLP
1100 New York Ave., NW, Suite 700
Washington, D.C.  20005

Laura Davis Jones, Esquire
Timothy P. Cairns, Esquire
PACHULSKI, STANG, ZIEHL, & JONES LLP
919 N. Market Street, 17th Floor
Wilmington, DE  19899

Attorneys for Appellant

Barbara I. Michaelides, Esquire (ARGUED)
Matthew J. Fink
Agelo L. Reppas
BATES & CAREY LLP
191 North Wacker Drive, Suite 2400
Chicago, IL  60606

Attorneys for Appellees

_____

OPINION

_____

WEIS, Circuit Judge.

In this appeal, a policyholder seeks to recover expenses incurred in defending against claims for which the insurance company denied coverage. Wending through a thicket of inclusions and exclusions leads to the conclusion that the District Court properly entered summary judgment in favor of the insurer. Accordingly, we will affirm.

### A.     Alleged Liability of The Foundation to Lorillard: The Underlying Suit

American Legacy Foundation, a Delaware non-profit corporation, was formed by the terms of the 1998 Master Settlement Agreement ("MSA") between 46 states' attorneys general and the country's largest tobacco companies. Among these was Lorillard Tobacco Company, whose dispute with the Foundation is at the root of the case now before us. The Foundation's mission, as initially set forth in the MSA and incorporated into its own bylaws, was to educate the public about the dangers of tobacco products in order to reduce their use among America's youth.

The MSA provided that the tobacco companies would fund advertising campaigns, developed by the Foundation, that demonstrated the negative impact of tobacco product usage. The ads were to be concerned only with the "addictiveness, health effects, and social costs related to the use of tobacco products." Ads that amounted to a "personal attack on, or vilification of," tobacco companies or their employees were prohibited.

3

The Foundation created a series of television and radio ads branded "the truth(™)." These ads were brash, edgy, impertinent, and disrespectful, to appeal to those teens and young adults who were believed to be more likely to use tobacco products. The ads portrayed Lorillard and other tobacco firms in a mocking and unfavorable light.[1]

In 2001, Lorillard sent a cease-and-desist letter to the Foundation, threatening to file suit over one of those ads. A draft complaint included with the letter alleged various torts, including slander per se and per quod, libel per se and per quod, secondary libel, and unfair or deceptive acts or practices. Lorillard's letter also suggested that it might also pursue breach of contract claims.

In a letter of January 18, 2002, Lorillard followed up with a "Notice of Intent to Initiate Enforcement Proceeding Under MSA." There, Lorillard asserted that the Foundation had improperly used the funding designated by the MSA for public

---

[1] In addition, the Foundation maintained a website that permitted visitors to complete and send a pre-formatted email to tobacco company employees by inserting adverbs, adjectives, verbs and nouns. The website instructed users not to use profane or harassing language in their messages, but Lorillard employees received many abusive and profanity-laced emails through this program. Eventually, Lorillard installed a filter that blocked these messages, and the Foundation removed the email feature from its website.

education and failed to meet its obligations under that agreement.

The Foundation peremptorily filed a declaratory judgment action against Lorillard in Delaware Chancery Court on February 13, 2002. Six days later, Lorillard brought suit against the Foundation in North Carolina state court. That complaint included no tort claims but alleged breach of the MSA and of the covenant of good faith and fair dealing.

Lorillard counterclaimed against the Foundation in the Delaware Chancery Court in September 2002, asserting breach of the MSA; breach of the duty and covenant of good faith and fair dealing implied in the MSA; violations of the Foundation's bylaws and certificate of incorporation; a declaratory judgment that the Foundation was not eligible for public funding under the MSA; and trespass to chattel. The North Carolina suit was stayed and remained pending while the parties litigated the Delaware matter.

In January 2003, the Delaware Court of Chancery held that the Foundation, though not a signatory to the MSA, could be held liable for violations of that agreement. Granting summary judgment to Lorillard on this issue, the Chancery Court found that the Foundation had adopted the MSA, both expressly and "implicitly by accepting its benefits with knowledge of its terms." Am. Legacy Found. v. Lorillard Tobacco Co., 831 A.2d 335, 348-50 (Del. Ch. 2003). Therefore, the Court concluded that the Foundation was bound by the MSA's provisions. Id. at 351.

5

After lengthy discovery and motions practice, including cross-motions for summary judgment, the Chancery Court found that the ads in question did not breach the MSA. Specifically, the ads did not violate the anti-vilification clause because they did not incorporate "scurrilous [or] vitriolic attacks[,]" nor did they amount to "cruel slander. . . . public ridicule, traduction, or calumny." Am. Legacy Found. v. Lorillard Tobacco Co., 886 A.2d 1, 32-33 (Del. Ch. 2005). In addition, the ads did not contain personal attacks because "none of the ads specifically identif[ied] a target of an alleged attack." Id. at 43. Accordingly, summary judgment was granted in favor of the Foundation in August 2005. Id. at 46.

On appeal, the Delaware Supreme Court affirmed the holdings of the Chancery Court on both the standing and liability issues. Lorillard Tobacco Co. v. Am. Legacy Found., 903 A.2d 728 (Del. 2006). Having carefully scrutinized four of the ads that Lorillard had asserted were contrary to the MSA, the court found that "[t]he advertisements are not invidious, disparaging, offensive, belligerent, nor fiercely or severely critical. Nor are they denouncements that are both unfounded and abusive or slanderous. . . . [They] do not qualify as personal attacks or vilifications." Id. at 742.[2]

---

[2] The Chancery Court's denial of injunctive relief on the e-mail messages was affirmed because the website had been removed and damages, if any, were de minimus. Although those communications were personal attacks, that claim had been dismissed by the Vice Chancellor for failure to prosecute, and Lorillard did not appeal that dismissal. Lorillard Tobacco Co.

6

Moreover, because Delaware law provided that a corporation was bound by its preincorporation agreement "if [it] expressly adopts th[at] . . . agreement or implicitly adopts it by accepting its benefits with knowledge of its terms," the Delaware Supreme Court found the Foundation's cross-appeal to be "without merit." Id. at 745.

**B.     The Foundation v. National Union: The Current Litigation**

During the time it was publishing the ads at issue in the Lorillard suits, the Foundation had in effect a number and variety of insurance policies. Of the four comprehensive general liability ("CGL") policies, three had been written by Travelers Indemnity Company of America and another by Scottsdale Insurance Company. In addition, National Union Fire Insurance Company of Pittsburgh, Pa., had issued an Individual and Organization ("I&O") Policy as well as umbrella insurance to the Foundation.

After receiving Lorillard's November 13, 2001, cease-and-desist letter, outside legal counsel for the Foundation instructed its broker to "immediately put on notice – and demand defense and indemnity from – all insurers (primary, umbrella and excess; general liability, D&O, etc.) that issued potentially applicable policies." The broker responded by sending a notice of occurrence form to National Union and Travelers on December 4, 2001.

_____

v. Am. Legacy Found., 903 A.2d 728, 743-44 (Del. 2006).

7

In April 2002, Travelers denied coverage for the North Carolina claim but did not address the Delaware litigation. In a letter of December 6, 2002, two months after Lorillard filed its counterclaims, National Union similarly advised that the claims presented in the North Carolina suit were not insured under the I&O Policy because suits arising out of breach of contract were excluded. In addition, that insurer – evidently unaware of Lorillard's counterclaims, filed two months earlier – wrote that no costs from the Delaware action would be covered because "affirmative prosecution of a lawsuit is not a Claim under the Policy."

Nearly three months later, on February 26, 2003, the Foundation advised its broker that the Delaware suit was moving forward on Lorillard's counterclaims and requested that the broker "immediately contact all insurers . . . and demand any defense and indemnity as may be owed."

In April 2003, National Union told the Foundation that its umbrella policies would not insure liability from the lawsuits under either of the two coverage options, A or B. On August 13, 2003, that insurer further advised that it did not believe coverage was applicable under the I&O Policy. Notwithstanding its denials of coverage, National Union requested, and the Foundation provided, six litigation status reports between December 2003 and March 2006.

In February 2007, Scottsdale Insurance Company reviewed the "Suit Papers" from the Lorillard lawsuits, which it apparently had not received until that time. In its acknowledgment, Scottsdale informed the Foundation that it had

8

no knowledge of Lorillard's counterclaims until one year after they had been adjudicated and, because of late notice, would provide no insurance.

In May 2007, after all of the potentially applicable insurers had denied coverage, the Foundation filed this action in the United States District Court for the District of Delaware, to recover the approximately $17 million it claims to have spent defending against Lorillard's suit. After an extensive review of the various policies' provisions, the Court concluded that no insurance was applicable and entered judgment in favor of National Union. This appeal followed.

# I.

The District Court had jurisdiction over this diversity action under 28 U.S.C. § 1332. Appellate review is authorized by 28 U.S.C. § 1291. We review de novo the grant of summary judgment. The District Court's interpretation of the insurance policies at issue is likewise a determination of law subject to plenary review. See Alexander v. Nat'l Fire Ins. of Hartford, 454 F.3d 214, 219 n.4 (3d Cir. 2006); Universal Underwriters Ins. Co. v. Travelers Ins. Co., 669 A.2d 45, 47 (Del. 1995). The parties agree that no conflict of laws issue is present because controlling law in the District of Columbia, where the Foundation has it offices, and Delaware, the state in which National Union is incorporated, are similar.

## II.

As with all contracts, insurance policies are interpreted to give effect to their plain language:

> "Clear and unambiguous language in an insurance policy should be given its ordinary and usual meaning. . . . [W]hen the language of an insurance contract is clear and unequivocal, a party will be bound by its plain meaning . . . . To the extent that ambiguity does exist, the doctrine of contra proferentum requires that the language of an insurance contract be construed most strongly against the insurance company that drafted it."

Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1195-96 (Del. 1992) (citations omitted) (second alteration in original).

In addition, "[t]he duty to defend may . . . be broader than the duty to ultimately indemnify." Am. Ins. Grp. v. Risk Enter. Mgmt., Ltd., 761 A.2d 826, 830 (Del. 2000). To determine whether an obligation to defend exists under the usual liability policy, the "court typically looks to the allegations of the complaint to decide whether the third party's action against the insured states a claim covered by the policy." Id. at 829. So long as one count or claim is covered under the policy, the duty to defend is triggered. Any doubt or ambiguity as to the pleadings or the policy terms should be resolved in favor of the insured. See Cont'l Cas. Co. v. Alexis I. duPont Sch. Dist., 317 A.2d 101, 105 (Del. 1974).

10

## III.

In the interests of clarity, we will discuss the pertinent provisions of each insurance agreement at issue, and analyze the coverage available under it, separately.

### A. The I&O Policy

In its I&O Policy, National Union agreed to

> "pay on behalf of the [Foundation] Loss arising from a Claim . . . against the [Foundation] . . . for any actual or alleged Wrongful Act [defined in relevant part as] "any breach of duty, neglect, error, misstatement, misleading statement, omission or act by or on behalf of the [Foundation as well as] libel, slander, defamation or publication or utterance in violation of an individual's right of privacy."

Unlike typical liability insurance, the I&O Policy explicitly stated that National Union "d[id] not assume any duty to defend" unless defense of the case was tendered in writing by the policyholder. The Foundation does not contend that National Union was asked or required to assume the defense of the Lorillard litigation.[3]

---

[3] It may have been a strategic move on the part of the Foundation to exclude independent insurance counsel from controlling litigation that could have resulted in numerous

11

Rather, the Foundation's coverage claim is based on another provision of the I&O Policy, which obligated National Union to

> "advance . . . at the written request of the [Foundation], Defense Costs prior to the final disposition of a Claim.  Such advanced payments by [National Union] shall be repaid to [National Union] by [the Foundation] . . . in the event and to the extent that [the Foundation] shall not be entitled under the terms and conditions of this policy to payment of such Loss."

National Union's undertaking to advance costs was not open-ended, however.  The policy further stipulated that the Foundation

> "shall not . . . incur any Defense Costs without the prior written consent of [National Union].  Only those . . . Defense Costs which have been consented to by [National Union] shall be

---

claims in multiple states, with either the purpose or effect of evading or unraveling the MSA.  We note that amicus curiae briefs were filed in the Chancery Court on behalf of 34 states and 20 other organizations concerned with tobacco-related health issues.  Thus, there may well have been subtle, underlying concerns more important to the Foundation at that time than the cost of defending Lorillard's counterclaims.

12

recoverable as Loss under the terms of this policy."

Another limitation was detailed in the I&O Policy's Exclusion (k), which denied coverage for claims

"alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of [the Foundation] under any express contract or agreement."

Nevertheless, this exclusion would not apply, and coverage would be provided, if "liability . . . would have attached in the absence of such express contract."

1.

The District Court concurred with the Chancery Court's conclusion that the Foundation "had an explicit relationship to the MSA." Am Legacy Found. v. Nat'l Union Fire Ins. of Pittsburgh, Pa., 640 F. Supp. 2d 524, 538 (D. Del. 2009). Alternatively, the District Court observed, "the MSA can be held to be an implied in fact contract as it relate[d] to [the Foundation]," which "implied in fact contract ha[d] the legal equivalency of an express contract." Id. n.33. Finding that Lorillard's claims in the underlying suit were based upon breach of that express contract, the District Court held that Exclusion (k) of the I&O Policy precluded coverage. Id. at 537-38.

Furthermore, the District Court decided that because Lorillard had not alleged libel or slander in the underlying cases,

13

Exclusion (k)'s "escape clause," restoring insurance for those contractual claims that would have "attached in the absence of [an] express contract," did not apply. Id. at 538-39. No basis therefore existed to invoke National Union's "duty to defend."[4] Id. at 539.

2.

The Foundation's request for relief in the case before us is not based on a refusal to assume the defense but rather the failure to advance the costs of the defense. These are discrete concepts. When an insurance company assumes a defense, it retains and remunerates counsel; ordinarily no reimbursement of legal fees is required, even if the underlying claim proves false, fraudulent, or unfounded. In contrast, if an insurer agrees to advance the costs of a defense, as stated earlier, the insured must request in writing the insurer's consent before incurring defense costs and may be required to repay the insurer for advanced payments.

The starting point of the coverage analysis is whether the duty to advance costs was activated, and if so, when. National Union's policy does not state when the advance payments were due other than "prior to the final disposition of a Claim." The record reveals no explicit requests for National Union's prior approval of particular, designated defense expenses, nor any

---

[4] Although they are distinct entitlements, the District Court as well as the parties sometimes used the terms "duty to defend" and "duty to advance defense costs" interchangeably.

14

demands by the Foundation for payment of accrued defense costs, at any time before final resolution of the Lorillard suit. Nor did the Foundation challenge National Union's denial of coverage, based on Exclusion (k), until the filing of this suit. Both parties, in short, seemed content to await the ultimate disposition of the Lorillard claims before turning to the insurance coverage issues.

Policyholders in other cases were more forceful in asserting their positions. In Little v. MGIC Indemnity Corp., 836 F.2d 789 (3d Cir. 1987) (applying Pennsylvania law), it was "undisputed that [the policyholder] ha[d] obtained from [the insurer] whatever consent" was required as to the defense costs incurred. Id. at 795. The dispute there involved when the advance payments were to be made. In a declaratory judgment action filed before resolution of the underlying suit, this Court held that the insurer had the duty to advance costs as they came due rather than wait for termination of the underlying claim. Id. at 793-95.[5]

---

[5] Most courts that have confronted this issue "have ruled that defense costs should be paid contemporaneously as they are incurred." Barry R. Ostrager & Thomas R. Newman, Handbook on Ins. Coverage Disputes, § 20.02[i], at 1525-26 (15th ed.) (citing cases). "Other courts, however, have ruled that absent a specific provision addressing the timing of reimbursement of defense costs, insurers must reimburse defense costs only upon a determination that the losses are covered under the policy." Id. at 1526 (citing cases).

15

Brown v. American International Group, 339 F. Supp. 2d 336 (D. Mass. 2004), was likewise a declaratory judgment action.  There, the court concluded that the duty to advance costs was in effect so long as the underlying complaint suggested a reasonable potential for coverage.[6]  Id. at 346-47.  The court also held that an exclusion cited by the insurance company to deny all coverage did not control.  Accordingly, the duty to advance costs remained viable.  Id.  Like Little, Brown was filed after the underlying litigation began but before any determination on liability had been made there.  And, as with Little, Brown did not result in a monetary judgment.  Id. at 347.

The Foundation argues that the duty to advance payment of defense costs was triggered by Lorillard's allegations in the counterclaims, the same criterion for determining when the obligation to defend arises in most liability policies.  Although that argument may have some weight when an I&O policyholder seeks an interim determination of coverage, it does not win the day here.  At no point before suit was filed in the District Court did the Foundation seek a declaratory judgment contesting the application of Exclusion (k), nor did it demand payment of expenses as they came due.  A free-floating obligation must be tied to something of substance to be enforceable, in this case, a demand for specific sums of defense costs.  Nor was a written request for National Union's consent sought by the Foundation at any time before it brought this suit.

_____

[6] This test appears to be more flexible than strict adherence to the text of the underlying complaint as is the practice with duty to defend provisions.

16

Instead, the Foundation's complaint in the District Court sought a monetary judgment of at least $16,828,946.41.[7] This legal action did not commence until after the Delaware Supreme Court had resolved the underlying dispute, holding that the Foundation had not committed any wrongful act against Lorillard. At that point, final determination of the issues arising under the I&O Policy as to the Lorillard claim had been reached. Speculation at an earlier stage in the Delaware suit as to what might have been the outcome of that litigation should not now be the basis for a monetary judgment.

The case before us is akin to American Insurance Group v. Risk Enterprise Management Ltd., supra, 761 A.2d 826. There, a personal injury proceeding had settled after many months of discovery. At that point, the insurer denied a putative additional insured's request for reimbursement of the cost of

_____

[7] The Foundation here has broadly alleged that "all . . . conditions and prerequisites to coverage under the [various] Policies have been satisfied or waived." Compl. ¶¶ 34, 40, 46. However, its complaint does not explicitly assert compliance with the I&O Policy's requirement of prior approval by National Union of defense costs, and nothing in the record suggests that the Foundation sought any insurer's written approval of defense costs prior to incurring them. In that respect, this case is unlike Little and falls within the comment in Rhone-Poulenc, that "[i]n order for an insured to establish the contractual liability of an insurer for breach of an insurance contract, the insured must show that he has complied with all conditions precedent to the insurer's performance." 616 A.2d at 1198.

17

defending the tort action along with the amounts paid in settlement.  Id. at 827.  The Delaware Supreme Court, commenting on the purported insured's delay in demanding a defense, observed that the "determination of whether a duty to defend existed is being made after the underlying litigation has already been settled.  For th[is] reason[ ], the urgency that often exists at the outset of litigation is not present."  Id. at 829.  Accordingly, the Court ruled that determination of coverage must be based on the whole record, including the evidence developed through discovery.  Id. at 829-30.

The same rationale is pertinent under the I&O Policy dispute here.  The legal and factual basis for resolution of the Lorillard suit had been finally adjudicated before the Foundation filed this action to recover defense expenditures.  Whatever might have been an obligation to advance moneys during early stages of the Lorillard litigation we need not decide.  Reality, not conjecture, establishes that the Foundation is not now entitled to recovery of unadvanced costs of defense under the I&O Policy.

3.

Even if this were not the case, we agree with the District Court that coverage under the I&O Policy for the Lorillard claims was barred by Exclusion (k), which provided that National Union would not be liable to make

> "any payment for Loss . . . alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of an insured under any

18

express contract or agreement; provided, however, that this exclusion shall not apply to liability which would have attached in the absence of such express contract or agreement[.]"

According to the Foundation, Lorillard's North Carolina complaint and Delaware counterclaims alleged violations of an implied contract as well as an express one. The Foundation argues that the Chancery Court found that it had adopted the MSA "implicitly" as well as expressly and, therefore, Exclusion (k) was not operative.

We reject that argument. The discussion in the Chancery Court opinion upon which the Foundation relies involved the question of standing – specifically, whether the Foundation had "adopted" the MSA and could be held liable for breach of that agreement. That court held, and the Delaware Supreme Court affirmed, that the Foundation had adopted the MSA and was bound to its terms and conditions.

Lorillard alleged breaches of the MSA, not of any "implied" obligation to adopt or adhere to that agreement. As the Chancery Court summarized the litigation, "[B]oth [parties] agree that the matter presented is a straightforward contractual issue that turns on the legal interpretation of the words of the [MSA]." 886 A.2d at 8.[8]

---

[8] For the same reasons, we conclude that coverage for defense against Lorillard's counterclaim for "Breach of the Duty and Covenant of Good Faith and Fair Dealing" is likewise

19

Additionally, the Foundation asserts that Lorillard's allegations – that the Foundation's ads breaching the MSA's proscriptions against "vilification" of and "personal attacks" against the tobacco companies – were, in effect, tort claims and therefore not affected by Exclusion (k).

We disagree. The opinions of the Delaware courts make clear that the rulings against Lorillard were not founded on torts of libel, slander, or disparagement. See, e.g., Barry R. Ostrager & Thomas R. Newman, Handbook on Ins. Coverage Disputes, § 20.02[h][3] (15th ed.) (where same or similar exclusion was present, coverage for claims was excluded, whether such claims sounded in tort or contract, so long as they were "undeniably linked" to contractual claims).

We are persuaded that Exclusion (k) remained in effect and, for this additional reason, the I&O Policy did not provide insurance for any part of the Lorillard claims.

---

precluded by Exclusion (k) of the I&O Policy. As that claim explicitly stated, "Implied in the MSA is a duty and covenant of good faith and fair dealing." Def.'s Answer & Countercl. to 1st Am. Compl. 40, ¶65 (emphasis added). In other words, Lorillard alleged a breach of a duty that was an inherent part of the MSA – and indeed, part of all contracts. The mere presence of the word "[i]mplied" in the counterclaim does not invoke Exclusion (k)'s escape clause. See generally Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 441-42 (Del. 2005) (implied covenant of good faith and fair dealing attaches to all contracts).

### B. *National Union Umbrella Policy: Coverage A*

The National Union Umbrella Policy provided two differing coverages, A and B.

Coverage A was "excess follow-form;" that is, it adhered to "the terms, definitions, conditions and exclusions of Scheduled Underlying Insurance." This additional protection was in force only if the underlying policies were in effect and their limits had been exhausted. The District Court considered the CGL policy written by Travelers as being "Scheduled Underlying Insurance" to the National Union Umbrella. The Foundation initially named Travelers as a co-defendant in the suit before us, but dismissed after a settlement and no longer has any claim against that company.

Another potentially underlying policy, though not characterized as such, had been issued by the Scottsdale Insurance Company. That insurer did not receive any notice of the Lorillard suit until February 2007, many years after it was filed, and denied coverage for lack of notice. The Foundation does not assert any claim that National Union's obligation "dropped down" to fill the gap caused by Scottsdale's rejection.

At oral argument, the Foundation reiterated that it was making no claims under coverage A.[9]  We proceed then to Coverage B.

### C.  National Union Umbrella Policy: Coverage B

Coverage B provided umbrella insurance that would

"pay on behalf of the Insured those sums . . . that
the Insured bec[a]me[ ] legally obligated to pay as
damages by reason of liability imposed by law . . .
because of . . . Property Damage, Personal Injury
or Advertising Injury not covered by Scheduled
Underlying Insurance."

The underlying policy written by Travelers excluded personal injury coverage "arising out of [the insured's] business" if such business was "advertising, . . . broadcasting or telecasting done by or for [the insured]."  Therefore, the

_____

[9] The District Court found that the underlying Travelers policy "specifically exclude[d] coverage for 'advertising injury' resulting from 'breach of contract'" and, therefore, National Union's Coverage A was not invoked.  640 F. Supp. 2d at 540. The Court also held that, because the primary policy issued by Scottsdale overlapped the National Union umbrella by only eight days, the Scottsdale policy was not scheduled underlying insurance.  Id.  In light of the Foundation's abandonment of any claim under Coverage A, we decline to address these findings of the Court.

22

Foundation argues, because Travelers did not cover such personal injury, the umbrella came into effect. National Union's umbrella policy insured against "personal injury," defined in relevant part as

> "oral, written or electronic publication of material that slanders or libels a person or organization, or disparages a person's or organization's goods, products or services."

We agree that, if the alleged "Personal Injury" came within the scope of Coverage B and applicability was not otherwise excluded, National Union would have a duty to defend. Because the umbrella policy did not contain an obligation to advance costs, but provided only for the duty to defend, the customary test for assumption of defense is utilized – that is, we examine the allegations in the complaint, rather than proceeding to the ultimate result of the underlying suit. In this respect, the umbrella differs from the defense cost advancement provisions of the I&O Policy.

The District Court held that, because Lorillard's claims sounded in contract rather than tort, Coverage B was not available for protection against allegations of Personal Injury,

23

and, accordingly, National Union had had no duty to defend.[10] 640 F. Supp. 2d at 541.

The Foundation here asserts that Lorillard charged that the ads amounted to disparagement, libel or slander and so fell within the definition of Personal Injury under Coverage B. Accordingly, National Union had a duty to defend.

That argument fails. Lorillard's complaint and counterclaims did not allege that the ads were slanderous, libelous, or disparaging. No challenge to the truthfulness of the ads' contents was before the state courts. The fact of falsity is a predicate for libel, slander or commercial disparagement, and in its absence no cause of action for these torts was claimed, much less established. See, e.g., Neurotron Inc. v. Med. Serv. Ass'n of Pa., 254 F.3d 444 (3d Cir. 2001); see also Gannett Co. v. Kanaga, 750 A.2d 1174, 1183 (Del. 2000) (plaintiff in libel case "had to demonstrate 'actual injury,' absent a showing of knowledge of falsity or reckless disregard for the truth"). Therefore, the counterclaims failed to set out a tort cause of action.

Moreover, Lorillard was specific in its claims for relief. Nowhere in its meticulously drafted counterclaims, numbering 88 paragraphs, did Lorillard seek damages for libel, slander or

---

[10] The District Court also decided that "Advertising Injury" was barred by Exclusion O. 640 F. Supp. 2d at 541. Because the Foundation is not now pressing a claim for Advertising Injury, we need not review that determination.

24

disparagement of product. The requests for relief were founded on alleged breaches of contract.[11] The <u>ad</u> <u>damnum</u> clauses, specifically directed to each counterclaim, requested declaratory judgments; entry of an order that the Foundation had breached the MSA and directing compliance with it; and injunctive action.

Because Lorillard did not allege facts constituting "Personal Injury" as defined in the Umbrella Policy, a duty to defend under Coverage B was not triggered. We conclude that none of National Union's policies entitle the Foundation to recover expenses incurred in defending the Lorillard claims.

The judgment of the District Court will be affirmed.

---

[11] Lorillard's sole request for damages was based upon its claim for trespass to chattel, that is, the Foundation's "intentional[ ] intermeddl[ing] with Lorillard's e-mail system and computer network." Def's. Answer & Countercl. to 1st Am. Compl. 45 ¶ 84. That claim, which sought $1,000 for the cost of installing an e-mail filter, was abandoned during the proceedings in the Chancery Court. In any event, the umbrella policy's Exclusion R, which precludes insurance for "Property Damage expected or intended from the standpoint of the Insured," would bar any coverage for the trespass to chattels claim.

Fuentes, <u>Circuit Judge</u>, Concurring:

This appeal presents the question of an insurer's duty to advance costs, not the question of an insurer's duty to assume a defense. I agree that these are distinct concepts. Once this distinction is recognized, the most important question in this case is not whether National Union was obligated to pay for a defense but when and how it was obligated to do so. From this perspective, the question is whether the Foundation is entitled to recover the costs of its defense at the end of its dispute with Lorillard or whether it should have been encouraged to pursue its contractual right to advance payments at the earliest stages of that dispute. While I agree with the majority's excellent opinion and its conclusion, I write separately to emphasize the importance of this question of timing: when and how should a request for advance defense costs be presented?

Typically, this question is answered by application of the so-called "eight corners rule," under which an insurer's duty to defend is determined solely by reference to the complaint and the insurance policy. *See Stevens v. United Gen. Title Ins. Co.*, 801 A.2d 61, 66 n.4 (D.C. 2002). If even one count or claim of the complaint is covered by the policy, the duty to advance costs is triggered. *See Cont'l Cas. Co. v. Alexis duPont Sch. Dist.*, 317 A.2d 101, 105 (Del. 1974). Of course, any doubts as to whether the claim is covered, and any ambiguities in the contract, are resolved in favor of the insured. <u>Id.</u> The eight corners rule serves an important purpose, encouraging the swift preliminary resolution of coverage disputes. Early resolution is advantageous "both to

1

provide the insured with a defense at the beginning of the litigation and to permit the insurer, as the defraying entity, to control the defense strategy." *Am. Ins. Group v. Risk Enter. Mgmt., Ltd.*, 761 A.2d 826, 830 (Del. 2000).

I agree with the majority that this is not a typical case. As the majority points out, the record is devoid of evidence that the Foundation challenged National Union's denial of coverage, demanded payment for accrued defense costs, or requested National Union's approval of particular expenses at any time before the final resolution of the Lorillard suit. Slip Op. at 17, 19-20. Under these circumstances, the Foundation's delay in seeking advanced cost eliminated any urgency that might have been present at the outset of the litigation and placed this case within the exception described in *American Insurance Group*, 761 A.2d at 829.

The exception announced in *American Insurance Group* applies whenever an insured is dilatory in pursuing its rights under an insurance contract. In this situation, the eight corners rule does not apply and the court may look at the factual record developed during litigation. The exception, and the majority opinion's conclusion that the exception is applicable in this case, should not be read as a sign the eight corners rule is enervated. Rather, the exception described in *American Insurance Group* adds vitality to the rule by encouraging insureds to pursue early resolution of coverage disputes. As this case illustrates, failure on the part of an insured to forcefully pursue its claims early in an insurance dispute exposes the insured to the risk that the record developed during a lawsuit will be unfavorable to its

2

insurance case. In order to avoid this risk, insureds should forcefully pursue their claims, a course of action that ultimately benefits the insured, which may then receive the resources necessary to mount a defense; the insurer, which acquires the ability to supervise the costs of a defense; and the court system, which can more expeditiously and efficiently address coverage issues when they are presented in the same forum, and at the same time, as the underlying lawsuit.